1   THE COURT: Go ahead.

2   MR. HERREN: This has to do with the issue that we dis-
3   cussed earlier, concerning Elaine Aloysius and Mr. Simmons had
4   expressed that he was going to object, the part about that's
5   under 404(b), and so I was -- I wanted to bring that up before
6   I put her on the stand, just to explain the reason that I would
7   be calling a rebuttal witness, and why it would be admissible
8   under relevancy and under 404(b).

9   Mr. Herrera's testified that he purchased the gun, and
10  Mr. Simmons -- the thrust of Mr. Simmons' questions both in his
11  case, and on cross examination, seem to be pointed to an argu-
12  ment that, because Mr. Herrera owned the gun, that indicates
13  that he did not possess the gun during the time period. In
14  other words, the theory is, I've got the gun. I realized it
15  was illegal, so I sold the gun and never had anything to do
16  with it. Ms. Aloysius' testimony would be presented to show
17  that Mr. Simmons continued to have control over the gun even i
18  he did sell the gun to Mr. Herrera; that it was at his beck an
19  call, and that on at least one occasion in September,
20  Mr. Simmons simply phoned in an order for the gun. The gun wa
21  brought to him like a pizza, and he used it to, you know, he
22  possessed the gun at that point. And then the gun went back
23  Mr. Herrera's house.

24  So, that would be my application under 404(b) and under
25  relevancy for the testimony of Ms. Aloysius. Oh, to clarify,

Pg. 21

```
 1  apparently there are two different incidents involving
 2  Mr. Herrera -- or Mr. Simmons assaulting Ms. Aloysius, and
 3  calling Mr. Herrera for the gun.  In the first time, he called
 4  he was successful in having Mr. Herrera bring the gun.  The
 5  second time, in which Ms. Aloysius was extremely -- was beaten
 6  up severely with other objects, Mr. Simmons apparently phoned
 7  for the gun, but it never arrived.  I wouldn't be delving into
 8  the second one, which occurred apparently a couple of weeks
 9  after the first incident.
10       THE COURT:  Are you going to be delving into the fact of
11  an assault in the first instance, or just that, merely that the
12  gun came over and she saw it?  I mean.....
13       MR. HERREN:  Well, I would have to ask her -- I would have
14  to ask her -- I would want the jury to know that he actually
15  possessed the gun.
16       THE COURT:  I understand.  I wanted to know how extensive
17  you intend to go into the details of a possible other crime by
18  Mr. -- which is a 404.....
19       MR. HERREN:  I don't know how it can be extracted from, I
20  mean.....
21       THE COURT:  Well, I just -- I don't -- you know the back-
22  ground, I don't, I'm just going.....
23       MR. HERREN:  Okay.
24       THE COURT:  .....wanted to know how far -- what.....
25       MR. HERREN:  I guess, first of all, merely possessing the
```

1  gun in September would be another crime that hasn't been
2  charged, so that'd be another (indiscernible -- simultaneous
3  talking).....
4      THE COURT: Uh-huh, okay.
5      MR. HERREN: .....bad act. Pointing the gun at her would
6  obviously be another charge, but I don't know how that can be
7  extracted from her testimony.
8      THE COURT: Well, tell -- what do you think she will
9  testify to?
10     MR. HERREN: She will testify, I believe, that Mr. Simmon
11 and her got in an argument in early September. That, at one
12 point during the argument, Mr. Simmons called -- used the
13 phone, from her observations, called Mr. Herrera.....
14     THE COURT: She heard that?
15     MR. HERREN: .....and spoke to him, and -- huh?
16     THE COURT: She heard that?
17     MR. HERREN: She heard him call him.
18     THE COURT: Okay.
19     MR. HERREN: Apparently spoke in Spanish, and a short tim
20 after that, Mr. Herrera arrived, with a paper bag. Mr. Simmon
21 removed the gun from the paper bag, or Mr. Herrera did, and
22 handed it to him, I'm sure -- anyway, the gun got into
23 Mr. Simmons' hands, that they went into another room, and that
24 he.....
25     THE COURT: They?

1  MR. HERREN: .....threatened her with it.

2  THE COURT: Who went into another room?

3  MR. HERREN: Mr. Simmons and Mr. -- Mr. Simmons and
4  Ms. Aloysius.

5  THE COURT: Okay.

6  MR. HERREN: That he threatened her with it, and that he
7  came back out, gave it to Mr. Herrera, and he put it back in
8  the bag, and took off. And the reason -- I find it hard to
9  extract that, is because I want the jury to know that, you
10 know, that he gave it back to him, and that he took it back to
11 his house. And I would also note that 404(b) has been amended
12 and that, I believe, that the amendment is in effect, and it's
13 entirely different than that which appears in most of our rules
14 books.

15 THE COURT: What color is your rules book?

16 MR. HERREN: Green. It's been amended since then to read,
17 instead of what it says, it now reads, evidence of other
18 crimes, wrongs or acts, is not admissible, if the sole purpose
19 for offering the evidence is to prove the character of the
20 person, in order to show that he acted in conformity therewith.
21 It is, however, admissible for other purposes, including but
22 not limited to, proof of motive, opportunity, intent, prepara-
23 tion, (indiscernible) knowledge, identity, or absence or mis-
24 take or accident.

25 The legislative comments that go along with that, indicate

1  that the legislature intended it to change the rule from one
2  which is primarily a rule of exclusion, to one of inclusion,
3  along the lines of the federal rules.....
4      THE COURT:  Cause the reason I asked what, I noticed
5  yesterday that the evidence book that Mr. Simmons had, had a
6  white cover, which means it's out of date hopelessly, as op-
7  posed to this one, which is.....
8      MR. SIMMONS:  Your Honor, this is the 1991 Graham Feder-
9  al -- I believe Alaska now has conformed to this standard.....
10     THE COURT:  Okay, but I -- I was just worried about the
11 fact that you're using an old, old rule.
12     MR. SIMMONS:  Yeah, we have a green as well.
13     THE COURT:  Mr. Hopper has the recent -- the most recent
14 printed edition.  All right, what's your response to that.....
15     MR. SIMMONS:  Your Honor, that's not re -- rebuttal.
16 Mr. Simmons never asked Mr. Herrera if he had possession of the
17 handgun.  He asked Mr. Herrera if he purchased a handgun from
18 Mr. Simmons, so that I don't see what the State is actually
19 referring -- what testimony exactly.....
20     THE COURT:  Your response to that?
21     MR. HERREN:  Well, I think I've addressed it in my opening
22 statement, and that is, it's rebutting the thrust of
23 Mr. Simmons' case, and that is, that he sold the gun to
24 Mr. Herrera, and then never had anything to do with it.
25 Mr. Herrera did testify that, although he loaned it to

```
 1  Mr. Japhet (ph), and he loaned it to Mr. Michael, he never
 2  loaned it again to Mr. Simmons, and that's the.....
 3      THE COURT: Okay, going on to the next question. On to
 4  the next issue. We're you going to bring up another incident,
 5  or are you going to abandon that because it didn't -- the gun
 6  didn't come out.
 7      MR. HERREN: What's that?
 8      THE COURT: You said there was another time when -- that
 9  Ms. Aloysius could testify, that she got injured and that he
10  called for the gun, but it didn't come. Are you going to go
11  into that too? Okay.
12      MR. HERREN: I believe that would be.....
13      THE COURT: All right. I'm gonna allow the testimony.
14  Call in the jury. Get Ms. Aloysius in here.
15      (Jury present)
16      THE COURT: Ms. Aloysius, would you step -- take the stand
17  please. You are still under oath.
18                      ELAINE ALOYSIUS
19  previously sworn, called as a rebuttal witness on behalf of the
20  plaintiff, testified as follows on:
21                      DIRECT EXAMINATION
22  BY MR. HERREN:
23  Q    .....it's the microphone.....
24      THE COURT: Yeah, would you pin it on again, please? Up
25  close to your throat.
```

Exc. 62
Exc. 90
Ex. #3. p. 6

425

| | | |
|---|---|---|
| 1 | Q | Thank you.  Hello, Ms. Aloysius.  Do you know David Simmon |
| 2 | A | Yes, I do. |
| 3 | Q | And how did you first meet him? |
| 4 | A | I met him -- I met him at my sister's anniversary. |
| 5 | Q | Okay.  Approximately, when was that? |
| 6 | A | August the 15th, or s -- or later in August. |
| 7 | Q | August of last year? |
| 8 | A | Yes. |
| 9 | Q | Okay.  Did you develop a relationship with Mr. Simmons from that point? |
| 11 | A | Yes. |
| 12 | Q | Okay.  Have you ever seen Mr. Simmons with a handgun? |
| 13 | A | Yes. |
| 14 | Q | Do you remember approximately when that was? |
| 15 | A | That was early in September and late in September. |
| 16 | Q | Of last year? |
| 17 | A | Yes.  Exquse me, early in September of last year. |
| 18 | Q | Of last year?  And can you describe the circumstances in which you saw Mr. Simmons with a gun? |
| 20 | A | (No audible reply) |
| 21 | Q | Well, when did -- okay.  Why did he have the gun? |
| 22 | A | He had called over a friend of his to bring the gun.  His friend came over five minutes later and hand him a paper bag. |
| 25 | Q | And then what happened? |

Exc. 91
Exc. 63
Ex.#3. p. 7
101
426

```
 1  A    He took the paper bag and -- and brought me to the -- to
 2       the bedroom.
 3       MR. SIMMONS:  Objection.
 4       THE COURT:  What's the objection?
 5       MR. SIMMONS:  The witness is going into collateral mat-
 6  ters, Your Honor.
 7       THE COURT:  Overruled.
 8  BY MR. HERREN:
 9  Q    He took the gun, and took you where?
10  A    He took the bag and -- and brought me to the bedroom.
11  Q    And what happened in the bedroom?
12  A    He took the gun out of the paper bag.
13  Q    What did he do with the gun, when he took it out of the
14       bag?
15  A    Said he was going to teach me a lesson.....
16       MR. SIMMONS:  Objection, Your Honor.
17       THE COURT:  Overruled.
18  Q    He said what?
19  A    He said he was going to teach me a lesson.
20  Q    And what happened then?
21  A    He took the gun out of the bag, and put the gun to my
22       head.
23  Q    And then what happened?
24  A    I told him, if he was going to kill me, then make it quick
25       and fast.  Then he's -- he said he wasn't joking.  He
```

```
 1              said, this is not a joke.
 2   Q   Uh-huh.  Go on, what happened?
 3          THE COURT:  Well.  It's -- I'm not interested in the
 4   conversation, I'm interested in what he did the gun.
 5          MR. HERREN:  Okay.
 6   Q   What did he do with the gun after he pointed it at you?
 7   A   He opened the -- the cylinder and showed me the -- the
 8       bullets.
 9   Q   Did you see the bullets?
10   A   Yes.
11   Q   And what did he do with the gun after that?
12   A   Put it back in the bag.  Gave it to Mannie.  Mannie left.
13   Q   Okay.  What did the gun look like, do you remember?
14   A   It was a big gun.
15   Q   Do you remember what color it was?
16   A   It was dark.
17   Q   Can you either estimate inches, or show the jury how big
18       it was?
19   A   The cylinder was about that big (witness gesturing).
20   Q   If the record could reflect, she held her hands -- fingers
21       apart, approximately a foot.
22          THE COURT:  Correct.
23   Q   You said that he gave it to Mannie, is that the person
24       that brought it over in the first place?
25   A   Yes.
```

```
 1  Q    And who was that person?
 2  A    Mannie Herrera.
 3  Q    And Mannie took off after that?
 4  A    (No audible reply).
 5  Q    What does Mannie Herrera look like?  Can you just de-
 6       scribe.....
 7  A    Couldn't -- couldn't see him -- dark.....
 8  Q    Oh, but you recognized him as Mannie Herrera?
 9  A    Yes.
10  Q    Do you know what Mannie Herrera looks like?
11  A    Yes.
12  Q    What did he -- what does he look like?
13  A    He's.....
14  Q    Is he a caucasian, Native American, African American?
15  A    African American.
16  Q    Does he have any facial hair or did he at the time?  Any
17       facial hair, a mustache or a beard or.....
18  A    Has a mustache.  Has a beard.
19       MR. HERREN:  I don't have any other questions, thank you,
20  Ms. Aloysius.
21       THE COURT:  Cross examine?
22       MR. SIMMONS:  Thank you, Your Honor.
23                     ELAINE ALOYSIUS
24  testified as follows on:
25                     CROSS EXAMINATION
```

```
 1  will give you, to that, and decide whether Mr. Simmons is
 2  guilty or not guilty.
 3      The law that the judge will read to you, concerning the
 4  crime involved, will set out four different parts of the crime
 5  that the State is under an obligation to prove beyond a reason-
 6  able doubt.
 7      The first is, that the event in question occurred at or
 8  near Bethel, on or about the month of March or April, and the
 9  second count, on or about the month of July.
10      The second is, did the defendant knowingly possess a
11  firearm. The third is if the firearm's capable of being con-
12  cealed on one's person. The fourth, that the defendant pos-
13  sessed the concealable firearm after having been convicted of a
14  felony by a court of this state. I would argue to you that,
15  the element that is (indiscernible) the most important in this,
16  is whether or not the defendant, Mr. Simmons, knowingly pos-
17  sessed a firearm. The other elements of the case are not that
18  much in issue. You'll have the gun that's at issue, that
19  Mr. Simmons has already acknowledged having received in March.
20  And, obviously, that is concealable, that's a handgun.
21      That the defendant, Mr. Simmon was -- Mr. Simmons was
22  convicted of a felony. That hasn't been contested here either.
23  There are two documents that prove that, and those are called
24  judgments. You will read on those, that Mr. Simmons was con-
25  victed in 1985 of a felony, given a sentence of one year, and
```

1  you will read that also, in 1990, he was convicted of another
2  felony, and those documents that will prove that, so those
3  aren't an issue.
4       The time of the event in question occurred at or near
5  Bethel, that isn't an issue. So, the real question here, is
6  whether Mr. Simmons possessed -- knowingly possessed a gun, the
7  handgun in question.
8       The testimony that you've received is from Marilyn John-
9  son. In March of 1990, Marilyn Johnson and David Simmons
10 became boyfriend and girlfriend, essentially, and became -- and
11 began to live together. Marilyn and her two sons moved into
12 the trailer on Kwethluk Lane, with Mr. Simmons.
13      And Marilyn Johnson told you that, in April, she went to
14 Aniak as part of her job training. And was up there on a field
15 trip, she distinctly remembers it being of April of 1990, and
16 that, during that period, when she got back, Mr. Simmons had
17 received a box in the mail. And inside the box was a gun.
18 And, at that time, she said, she saw the gun. The gun was with
19 the holster, and it was placed in a back bedroom of the trail-
20 er.
21      She testified that later, in Mar -- the month of April, a
22 couple of weeks after it had arrived, she and her son Dennis,
23 and her other son, Sydney, and Mr. Simmons, went to the firing
24 range here in Bethel, and that she observed Mr. Simmons fire
25 the gun. She was close enough that, the sound was too loud,

1  and she took her son -- her youngest son, away, and went back
2  to the car. But that, while she was in the car, she could
3  observe Mr. Simmons firing. And that she had observed him
4  before she went back to the car.
5       The next step in this -- let me back up a little bit. You
6  heard the testimony of Mr. Jiles, who confirmed the fact that
7  he went with Mr. Simmons to the post office. He drove him to
8  the post office to pick up the box. He told Mr. Jiles that he
9  expected a gun to be in the box, and that there was a gun, and
10 that he showed it to Mr. Jiles. And Mr. Jiles testified that
11 he wasn't quite sure of the dates, but that he recalls that he
12 first saw Mr. Simmons after a long period of time, in March, in
13 mid March, the gun arrived. Approximately six weeks later, at
14 least a month later. That would place it in April.
15      And it's consistent with what Marilyn Johnson testified,
16 as well as Dennis Johnson. Marilyn Johnson also testified
17 that, in July, sometime around the 4th, she and David went
18 fishing, and that David took along the gun. And that she saw
19 the gun, and she saw the gun with Mr. Simmons. That testimony
20 has not been disputed.
21      What happened in between that, or around that time, is a
22 little unclear. But we do know that, during that period of
23 time, Mr. Simmons apparently misplaced the gun, or forgot where
24 it was, cause he went to Sarah Brink's house, across the
25 street, and said, did you -- your children take my gun? He re-

1 ferred to it as my gun. He described it as being a pistol.
2 And he said it was not a toy, it was real. And he was looking
3 for it.
4 Some time during that period also, he went to the moth-
5 er -- Paul Smith's mother-in-law's house, and was asking also
6 for the gun, and wondering where it was. And referred to it as
7 his gun.
8 The next step in this -- in the story, is that in later
9 July, there was a falling out between Marilyn Johnson and David
10 Simmons. And Marilyn went to the police, to get help to get
11 her belongings back. She testified that she went there solely
12 for that purpose. She was not seeking revenge from
13 Mr. Simmons. She just wanted her belongings back, and the
14 police cooperated in that. In finding out some of the regular,
15 normal things that they try to find out in these types of
16 situations, that is, if there are firearms. It occurred to the
17 police, that Mr. Simmons had a handgun, and that he wasn't
18 supposed to have a handgun, cause it's against the law for a
19 felon to have a handgun.
20 And so they applied for a search warrant, and they execut-
21 ed the search warrant, and in late July, the gun was no longer
22 in the back bedroom in a blue suitcase, where Marilyn had
23 thought it was and where she had recently seen it. Where was
24 the gun? Well, apparently, it was with Mr. Herrera.
25 Mr. Herrera testified that he purchased the gun from

```
 1  Mr. Simmons.  I would put to you that it is impossible for
 2  someone to sell a gun without having first owned it.  It's
 3  impossible for them to sell it, without first possessing it.
 4      Mr. Simmons will argue to you that he received the gun, he
 5  realized that he wasn't supposed to have it, and he immediately
 6  got rid of it.  Well, that just doesn't jive with the other
 7  testimony.  The testimony that he took it with him to the
 8  shooting range.  The testimony of Marilyn and Dennis Johnson,
 9  that he fired it at the shooting range.  The testimony of
10  Marilyn Johnson, that he took it along with them fishing.  And
11  it certainly does not jive with the testimony of Elaine
12  Aloysius, who said that, in September, and remember, this was
13  after Mr. Simmons was charged with the crime of having a hand-
14  gun -- was aware of its importance.  In September, Ms. Aloysius
15  was assaulted by Mr. Simmons in a manner that involved a gun.
16  In early September, Ms. Aloysius and Mr. Simmons had a falling
17  out, just as Marilyn Johnson did with Mr. Simmons.  And,
18  Mr. Simmons dialed up Mannie Herrera, and ordered to have the
19  gun brought over.....
20      MR. SIMMONS:  Objection, Your Honor.
21      THE COURT:  Sustained.
22      MR. HERREN:  What was the -- what am I getting into that's
23  not.....
24      THE COURT:  Ordered him, I think was the -- I mean, that
25  was -- should have been objected to.
```

    MR. HERREN: Characterize the evidence. I'm sorry. Mr. Simmons called up Mr. Herrera and asked to have the gun brought over. Mr. Herrera complied with the request, brought the gun over and Mr. Simmons used the gun to assault Ms. Aloysius. After he was done with the gun, he gave it back to Mr. Herrera, and Mr. Herrera put it back -- took it back to his house. And, shortly after that happened, of course, the assault was reported. And, the police, armed with that information, got a search warrant for Mr. Herrera's house, and went there, and lo and behold, found the gun, the gun that you'll have available to you in your deliberations.

    The conduct of Mr. Simmons throughout this time period is consistent with someone who owned, possessed and had dominion and control over a handgun. He had it sent to him in March, it got to him in April, he used it in April. He used it in July. He apparently misplaced it, and was looking for it in July, or late June. And then he tried to get rid of it, when he found out that it -- he might get in trouble for it. He got rid of it, in the sense that someone else was holding onto it. He got rid of it in the sense that he gave it, or sold it to Mannie Herrera.

    But it was still available to him, he still had control over it, because all he had to do was pick up the phone, and ask him to bring it over. And use for whatever purposes he wanted to use it. And that happened in September. And that's

1  consistent with Mr. Simmons possessing a gun.
2      There's some more corroborating evidence that I would like
3  you to consider. Mr. Moss testified that in -- sometime in
4  later summer of 1990, along while all this was happening,
5  Mr. Simmons approached him, and asked him to hold onto the
6  holster and the ammunition, and gave him the bag that it --
7  that it -- that was contained in. This was an apparent attempt
8  of Mr. Simmons to get rid of the evidence, to make sure that
9  the police didn't know that he had a gun, that he was possess-
10 ing a gun. Mr. Simmons apparently knew all along, that he
11 wasn't supposed to have a gun.
12     MR. SIMMONS: Objection.
13     THE COURT: Overruled.
14     MR. HERREN: And that's consistent with, not only
15 Mr. Moss' testimony, but the testimony of Marilyn Johnson, who
16 said that she -- that Mr. Simmons told him, that the reason
17 that they were putting it in her suitcase, in the back bedroom
18 in the closet, was because if the police came and found the
19 gun, it would be within her belongings. That shows that
20 Mr. Simmons knew what he was doing, he knew that he wasn't
21 supposed to have a gun, and that he acted in such a way as to
22 avoid being charged and convicted of possessing a handgun.
23     I would ask you to find, consistent with that testi -- or
24 that evidence, and that type of conduct, that Mr. Simmons did
25 possess a handgun. That he had been convicted of a felony.