IN THE SUPERIOR COURT FOR THE STATE OF ALASKA

FOURTH JUDICIAL DISTRICT

STATE OF ALASKA,              )
                              )
        Plaintiff,            )
                              )
vs.                           )
                              )
DAVID SIMMONS,                )
                              )
        Defendant.            )
_____)

Case No. 4BE-S90-0552 CR

TRANSCRIPT OF GRAND JURY PROCEEDINGS

                         Bethel, Alaska
                         1990
                         11:05 a.m.

APPEARANCES:             SUSAN A. PARKES
                         District Attorney's Office
                         1031 West Fourth Avenue, Suite 520
                         Anchorage, Alaska  99501



## TABLE OF CONTENTS

WITNESSES                                                    DIRECT

Elaine Aloysius                                                 10

John Hodges                                                    25

John Bilyeu                                                  32/35

Jose Herrera                                                   37

GEMINI
Reporting Services
943 West 6th, Suite 110
Anchorage, Alaska 99501
277-8591
Fax 272-9258

i

Page 2

1          PROCEEDINGS
2    4BEGJ-464
3        MS. PARKES: And again we're on record in the case of
4    State of Alaska versus David Simmons, it is 11:05. For the
5    record my name is Susan Parks, I'm an assistant district
6    attorney in the Anchorage office. I'm here to present a four-
7    count indictment for your consideration against Mr. Simmons. It
8    charges one count of burglary in the first degree, one count of
9    assault in the second degree, one count of assault in the third
10   degree, and one count of misconduct involving weapons in the
11   first degree.
12       Count I charges that on or about the 26th day of September
13   1990, at or near Bethel in the Fourth Judicial District, State
14   of Alaska, David Simmons did enter or remain unlawfully in a
15   building, the dwelling of Elaine Aloysius, 119 Atsaq -- excuse
16   my pronunciation -- with intent to commit the crime of assault
17   in a dwelling. This is a Class B felony offense.
18       Count II charges that on or about the 26th day of
19   September, 1990, at or near Bethel in the Fourth Judicial
20   District, State of Alaska, David Simmons unlawfully and with
21   intent to cause physical injury to Elaine Aloysius did cause
22   physical injury to her by means of a dangerous instrument, by
23   striking her with a flashlight, a humidifier or a baby seat, by
24   choking her with C-clamps, all of which is a Class C felony
25   offense.

Page 3

1        That on -- Count III charges that on or about the 4th day
2    of September, 1990, at or near Bethel in the Fourth Judicial
3    District, State of Alaska, David Simmons did unlawfully and
4    recklessly place Elaine Aloysius in fear of imminent physical
5    injury by means of a dangerous instrument, by pointing a pistol
6    at her and threatening to kill her, all of which is a Class C
7    felony offense.
8        Count IV charges that on or about the 4th day of September
9    1990, at or near Bethel in the Fourth Judicial District, State
10   of Alaska, David Simmons did unlawfully and knowingly possess a
11   firearm capable of being concealed on one's person after having
12   been convicted of a felony by a court of this state, all of
13   which is a Class C felony offense.
14       The witnesses that I expect you to hear from this morning
15   are two Bethel police officers, Sgt. Bilyeu and Officer Hodges.
16   We also expect to hear from Elaine Aloysius and from a Mr. Jose
17   Herrera. Is there anyone here who knows any of the witnesses or
18   the defendant? All right, I see one hand. Ma'am, is there
19   anything you know about them or your relationship with them that
20   would make it difficult or impossible for you to be.....
21       UNIDENTIFIED JUROR: I think I would be -- I know too much
22   about the defendant's background to be a fair and impartial
23   juror.
24       MS. PARKES: Okay. May we excuse this grand juror? I
25   don't know what your procedure is? Okay, for the record your

Page 4

1    name, ma'am?
2        UNIDENTIFIED JUROR: Carol Peters.
3        MS. PARKES: Okay, you may be excused, Ms. Peters.
4        UNIDENTIFIED JUROR: I don't have to come back today?
5        MS. PARKES: Not today, this is the last case. Is there
6    anyone else who knows anyone involved? Okay, I see no hands.
7    For the record, how many grand jurors are present, Madam
8    Foreperson?
9        FOREPERSON: 17.
10       MS. PARKES: 17 grand jurors. All right, let me read the
11   statutes and the definitions that are going to apply in this
12   case. First we'll go count by count. Count I charges burglary
13   in the first degree, that's Alaska Statute 11.46.300. Burglary
14   in the first degree charges a person commits the crime of
15   burglary in the first degree if the person commits the crime in
16   burglary in the second degree and the building is a dwelling.
17   Burglary in the second degree charges that a person commits the
18   crime of burglary in the second degree if the person enters or
19   remains unlawfully in a building with the intent to commit a
20   crime.
21       So for first degree the only difference is whether it was
22   merely a building or a dwelling. So if you find that we've
23   shown that Mr. Simmons entered a dwelling with the intent to
24   commit a crime, that would be burglary in the first degree.
25   Enter or remains unlawfully means to enter or remain in or upon

Page 5

1    premises or in a propelled vehicle when the premises or
2    propelled vehicle at the time of entry or remaining is not open
3    to the public or when someone fails to leave premises that is
4    open to the public after being lawfully directed to do so by the
5    person in charge.
6        A dwelling, defined a dwelling, the definition of a
7    dwelling means a building that is designed for use or is used as
8    a person's permanent or temporary home or place of lodging.
9    Premises means real property or any building. And the person
10   has to act with the intent to commit a crime, and a person acts
11   intentionally with respect to a result described by a provision
12   of law defining an offense when the person's conscious objective
13   is to cause that result. When intentionally causing a
14   particular result is an element of an offense, that intent need
15   not be the person's only objective. And a crime is defined as
16   means an offense for which a sentence of imprisonment is
17   authorized. It can be a felony or a misdemeanor.
18       So you need to find that he entered her dwelling with the
19   intent to commit a crime.
20       Assault in the second degree is under Statute 11.41.210
21   and it states a person commits the crime of assault in the
22   second degree if with intent to cause physical injury to another
23   person that person causes physical injury to another person by
24   means of a dangerous instrument. Again you have to be acting
25   with the intent, which I've previously defined for you.

Page 6

1  Physical injury, you have to have the intent to cause physical
2  injury. Physical injury means a physical pain or an impairment
3  of physical condition. A dangerous instrument means any deadly
4  weapon or anything which under the circumstances in which it is
5  used, attempted to be used or threatened to be used is capable
6  of causing death or serious physical injury.
7     Serious physical injury means physical injury caused by an
8  act performed under circumstances that create a substantial risk
9  of death, or physical injury that causes serious and protracted
10  disfigurement, protracted impairment of health, protracted loss
11  or impairment of the function of a body member or organ, or that
12  unlawfully terminates a pregnancy.
13     The third count is assault in the third degree and that's
14  found under Statute 11.41.220. A person commits the crime of
15  assault in the third degree if that person recklessly places
16  another person in fear of imminent serious physical injury by
17  means of a dangerous instrument. I believe I've already defined
18  a dangerous instrument as either a deadly weapon or anything
19  which under the circumstances in which it is used, attempted to
20  be used or threatened to be used is capable of causing death or
21  serious physical injury.
22     The mental state of assault in the third degree is
23  recklessly. Recklessly is defined as A person acts recklessly
24  with respect to a result or to a circumstance described by a
25  provision of law defining an offense when the person is aware of

Page 7

1  and consciously disregards a substantial and unjustifiable risk
2  that the result will occur or that the circumstance exists. The
3  risk must be of such a nature and degree that disregard of it
4  constitutes a gross deviation from the standard of conduct that
5  a reasonable person would observe in the situation. A person
6  who is unaware of a risk of which the person would have been
7  aware had that person not been intoxicated acts recklessly with
8  respect to that risk.
9     Finally, under misconduct involving weapons in the first
10  degree, that's found at Statute 11.61.200. A person commits the
11  crime of misconduct involving weapons in the first degree if the
12  person knowingly possesses a firearm capable of being concealed
13  on one's person after having been convicted of a felony by a
14  court of this state, a court of the United States or a court of
15  another state or territory. The mental state for this crime is
16  knowingly, and that definition is A person acts knowingly with
17  respect to conduct or to a circumstance described by a provision
18  of law defining an offense when the person is aware that the
19  conduct is of that nature or that the circumstance exists. When
20  knowledge of the existence of a particular fact is an element of
21  an offense, that knowledge is established if a person is aware
22  of a substantial probability of its existence, unless the person
23  actually believes it does not exist. A person who is unaware of
24  conduct or a circumstance of which the person would have been
25  aware had that person not been intoxicated acts knowingly with

Page 8

1  respect to the conduct or circumstance.
2     They have to have a firearm capable of being concealed,
3  and a firearm means a weapon, including a pistol, revolver,
4  rifle or shotgun, whether loaded or unloaded, operable or
5  inoperable, designed for discharging a shot capable of causing
6  death or serious physical injury. A person must have been
7  convicted of a felony. A felony means any crime for which a
8  sentence of imprisonment for a term of more than one year is
9  authorized.
10     Any questions about the indictment or any of the statutes
11  or definitions I've given you? Okay, I see no hands. Let me
12  just briefly outline the evidence that I expect to present this
13  morning. Remember, this is just my view of what I expect the
14  evidence to be. What I say is not evidence and if what you hear
15  from the witnesses is different from what I tell you you must
16  disregard what I say and you have to rely on what you hear from
17  the witnesses who testify under oath.
18     What you will hear, that -- is that David Simmons, the
19  defendant in this case, was in a relationship with the victim,
20  Elaine Aloysius. Apparently they were having some problems, and
21  on September 26th, 1990, Ms. Aloysius called Officer Hodges from
22  the Bethel Police Department and had him come to her home
23  because the defendant was there and she wanted him to leave and
24  he was refusing to do so. Officer Hodges responded to where she
25  was living. Mr. Simmons was there, he asked Mr. Simmons to

Pag

1  leave at her request, Mr. Simmons did leave.
2     After he left Ms. Aloysius told the officer that he had
3  forced his way in and showed him the door which had the lock
4  broken because of him forcing his way in. Officer Hodges left.
5  The police department then received another call later that Mr.
6  Simmons had again come back over and this time had broken in and
7  had assaulted Ms. Aloysius. He had broken in and he had
8  assaulted her by striking her on her head with a flashlight, a
9  baby swing and other items that were in the household,
10  threatening her and telling her he was going to kill her.
11     Officers observed that she had blood on her head, that she
12  had cuts in her head, there was blood on her clothing. At this
13  time she was over at a friend's house, she told the police that
14  she thought Mr. Simmons was still in her home, that she had
15  gotten away when he'd fallen asleep. Officers went over there,
16  did find him in the home, and arrested him and saw that he had
17  blood on some of his clothing from the assault.
18     During the interview with Ms. Aloysius they also learned
19  that there had been a prior assault on September 4th when she
20  had been over at Mr. Simmons' house where Mr. Simmons had had a
21  friend, Mr. Herrera, who you're going to hear from, bring over a
22  pistol, which he pointed at her head and threatened her with,
23  threatened that he was going to kill her and she was placed in
24  fear of her life for that.
25     You will also hear that at the time that Mr. Simmons

Page 10

1 pointed this gun, a pistol, he had a prior felony conviction at
2 the time he possessed this weapon.
3      That's what we expect the evidence to show. Is there any
4 questions at this time before I call my first witness? Okay,
5 we'll call Elaine Aloysius. She's on her way. Why don't we
6 just go off record for a minute. It's 11:19.
7      (Off record)
8      MS. PARKES: We're back on record, it's still about 11:19.
9 I've been informed that I've been mispronouncing Elaine's name.
10 The correct pronunciation of her last name is.....
11     MS. ALOYSIUS: Aloysius.
12     MS. PARKES: .....Aloysius. Does that make any difference
13 to anyone that they knew her and can't be a fair grand juror in
14 this case? Okay, I don't see any hands and I apologize for
15 that. Why don't we go off record again and wait for her again.
16 I should've cautioned you before, do not deliberate or talk
17 about this case while we're off record.
18     (Off record)
19     MS. PARKES: We're back on record, it's 11:21. Why don't
20 you take the stand? Raise your right hand and you'll be sworn
21 in. You need to stand and raise your right hand.
22     (Oath administered)
23     MS. ALOYSIUS: Yes, I do.
24            ELAINE ALOYSIUS,
25 called as a witness, testified as follows on:

Page 11

1            DIRECT EXAMINATION
2 BY MS. PARKES:
3 Q   Would you please for the record state your name, spelling
4     your last name?
5 A   My name is Elaine, last name Aloysius, A-L-O-Y-S-I-U-S.
6 Q   And your mailing address?
7 A   Is P. O. Box 2104, Bethel, Alaska, 99559.
8 Q   And your occupation?
9 A   I work as a foster care coordinator through AVCP, I am
10    presently under a contract for DFYS.
11 Q   And how long have you been doing that kind of work?
12 A   I have been employed through AVCP for about a month.
13 Q   Do you know David Simmons?
14 A   Yes, I know David.
15 Q   How long have you known him?
16 A   I've known him (indiscernible) August.
17 Q   Of '89?
18 A   Of '89.
19 Q   What kind of relationship did you have with Mr. Simmons?
20    Are you friends, were you romantically involved?
21 A   We were romantically involved.
22 Q   I'd like to ask you about incidents that occurred back on
23    September -- first September 26th, 1990. When -- where
24    were you living about that time?
25 A   I was temporary live-in at 119 Second Atsaq.

Page 12

1 Q   Is that your normal residence or is that a relative?
2 A   The residence belonged to my sister.
3 Q   Was Mr. Simmons living there?
4 A   No, he wasn't.
5 Q   Did you at some point call the police that night?  On that
6     date?
7 A   Yes, I did.
8 Q   And why was that?
9 A   The reason why I called was that I did not want to be
10    disturbed, I had arrangements to leave the next day, I did
11    not want to be bothered.
12 Q   And who was bothering you?
13 A   Everybody.
14 Q   When you called the police was Mr. Simmons there?
15 A   Yes.
16 Q   And was that why you called the police?
17 A   Part of the reason.
18 Q   And when the police arrived what -- what did you ask them
19    to do?
20 A   I asked them to escort him out of the house.
21 Q   And did they do that?
22 A   Yes, they did.
23 Q   Had you asked him to leave before then?
24 A   Yes, I did.
25 Q   And did he refuse to do so?  If you can answer audibly

Page 13

1     because this is being tape recorded.  Had he refused to
2     leave and that's why you called the police?
3 A   Yes.
4 Q   When he was there -- when he came over had he forced his
5     way in or had you voluntarily let him in?
6 A   He came in.
7 Q   Do you remember talking to Officer Hodges when he came to
8     the scene with Mr. Simmons?  You know the officer who
9     showed up?
10 A  In the.....
11 Q  That first time?
12 A  .....early afternoon?
13 Q  Uh-huh (affirmative).
14 A  What was the question?
15    THE CLERK: (Confers with district attorney, inaudible)
16    MS. PARKES: Okay.
17 Q  You need to sit a little closer to the microphone so it'll
18    pick you up.  Do you remember when the officer came that
19    first time and talking to him after he escorted Mr.
20    Simmons out?
21 A  Do I remember.....
22 Q  Uh-huh (affirmative).
23 A  .....him being there?
24 Q  Uh-huh (affirmative).
25 A  Yes.

**GRAND JURY PROCEEDINGS**                                    Page 10 - Page 13

## Page 14

1 Q   Okay, do you remember showing him the door being broken?

2 A   No.

3 Q   You didn't show him the door?

4 A   David did not force his way in the first time.

5 Q   Do you remember showing the broken door to the officer and

6     telling him he did force his way in?

7 A   No.

8 Q   Did you call the police again later that night?

9 A   Yes, I did.

10 Q   Let me ask you this. Are you here because you want to be

11     here?

12 A   No.

13 Q   And you're here because you're under subpoena, is that

14     correct?

15 A   Yes.

16 Q   And you'd prefer not to be testifying, is that correct?

17 A   Yes.

18 Q   Why is that?

19 A   I'm fed up, I'm tired, I just want to be left alone.

20 Q   All right, the second time you called the police that

21     night, where were you when you called them?

22 A   When I called them the second time I was at 121 Third.

23 Q   And whose house is that?

24 A   My sister Margaret's.

25 Q   This is a separate sister.....

## Page 15

1 A   Yes.

2 Q   .....different sister? And why did you call them? What

3     had happened?

4 A   That I -- I was very tired, and, like I said, I didn't --

5     did not want to be disturbed, I had reservations to leave

6     early that morning to a funeral that I had to attend. And

7     that's (indiscernible) my rest.

8 Q   Okay, and why weren't you getting your rest?

9 A   David was -- was there.

10 Q   He was where?

11 A   He was over at the house.

12 Q   Okay, where you had been living? He had come back after

13     the police had escorted him out, is that correct?

14 A   Yes, he -- he had -- he called and I told him not to call

15     any more, that I had reservation to leave early that

16     morning and -- and that I did not want to be disturbed,

17     that if he wanted to call me he can call me at 6:30 and he

18     took it as an invitation, that I had invited him over.

19 Q   So he came over?

20 A   Yes.

21 Q   Did he force his way in that time?

22 A   I couldn't tell, I was asleep.

23 Q   You were asleep when he came over?

24 A   (Indiscernible)

25 Q   Let me ask you this. Had you left your door unlocked?

## Page 16

1 A   I don't remember.

2 Q   Okay, do you remember telling the officers about him

3     coming in and telling the officers that you had put a

4     barricade up on the door because the lock was broken and

5     that he had kicked it down?

6 A   Well, it was very windy and the door automatically

7     opens.....

8 Q   Had you put anything in front of the door because.....

9 A   I had to to keep a draft from coming in.

10 q   So you had put something in front of the door?

11 A   Yes.

12 Q   And he would had to have gotten that out of the way,

13     correct, to get inside?

14 A   I believe so.

15 Q   And so you were in your room asleep. Did he come into

16     your room or where did he come? How did you know he was

17     there?

18 A   I heard.....

19 Q   What did you hear?

20 A   .....a noise and I got up.

21 Q   What did you hear?

22 A   I heard a noise and I got up.

23 Q   And what did you find when you got up?

24 A   I saw David standing there.

25 Q   Now, when he'd been calling you before had he been

## Page [17]

1     threatening you?

2 A   He's just a jealous guy who thinks that if I go

3     (indiscernible) that I'm automatically with someone,

4     so.....

5 Q   So is that a yes.....

6 A   .....he.....

7 Q   .....he was threatening you?

8 A   He made comments.

9 Q   What kind of comments?

10 A   That he had people watching the house.

11 Q   Did he also threaten to kill you?

12 A   I don't remember.

13 Q   Do you remember talking to the officer and giving an

14     interview?

15 A   (No audible response)

16 Q   Do you remember telling the Officer Hodges that he had

17     called and he was threatening to kill you?

18 A   I don't recall.

19 Q   Okay, why don't I show you a copy of your statement and

20     maybe this will refresh your recollection. The officer

21     says, go ahead, and you stated, he continued to call

22     threatening to kill me. Do you remember telling him th

23 A   I believe so.

24 Q   So he's calling you up threatening to kill you and he came

25     into your house while you were sleeping. What happened

## Page 18

1      when he got to the house?

2 A   He wanted to know why I wasn't answering the telephone.

3 Q   Did he start choking you? Need to answer

4      (indiscernible).....

5 A   (Indiscernible) could I answer this question.

6 Q   You are under oath and you are required to answer the

7      questions that I put to you truthfully.

8 A   I -- I can't recall it -- if he did, I've been under a lot

9      of pressure (indiscernible) this trip and was very tired,

10     so...

11 Q   Okay, when -- when you spoke to Officer Hodges that night

12     did you tell him the truth about what happened?

13 A   Yes and no.

14 Q   Okay, well, when you told him he disconnected the

15     telephone and started choking on me, is that what

16     happened?

17 A   The phone had been installed many times that week. My

18     sister had many children and she had to install a

19     telephone, I don't know if it was already disconnected or

20     easily can become disconnected.

21 Q   Okay.

22 A   And it was very dark and.....

23 Q   All right, so you're not sure about the phone. What about

24     the choking? Did he or did he not choke you?

25 A   We had an argument and.....

## Page 19

1 Q   Did he or did he not choke you?

2 A   Don't remember.

3 Q   All right, did he hit you with any items? Did he strike

4      you while was there?

5 A   I can't recall.

6 Q   Can't recall. Okay, did you have any injuries when you

7      called the police?

8 A   Yes.

9 Q   What kind of injuries did you have?

10 A   Had a cut on my head.

11 Q   And how did you get the cut on your head?

12 A   Well, as I said, we had an argument and -- and during the

13     argument as I was moving I -- I fell.

14 Q   You fell. That's not what you told the officers, though,

15     was it?

16 A   Well, that -- that could -- no, isn't what I told the

17     officers, but that is what happened.

18 Q   So you had a chance to review your statement before you

19     came in and testified at grand jury, didn't you?

20 A   Yes.

21 Q   And in your statement you told the officer he pushed me

22     and the swing came down and then I tried to put it back in

23     place and he pulled it, jerked it, jerked it and he took

24     it off the hinge, tried to choke me with it, tried to wrap

25     it around my neck. I pushed him and he pushed me. I

## Page 20

1      turned my back, he hit me over the head with -- with the

2      steel swing hangers. You told the officers that, didn't

3      you? That was in your statement, wasn't it?

4 A   Yes.

5 Q   And then you -- then the blood started running down my

6      face. Is that what you told the officers?

7 A   Yes.

8 Q   Is that what happened? Is that what happened?

9 A   Yes.

10 Q   Okay. And you also told the officers that he hit you with

11     a big humidifier, didn't you?

12 A   I was very upset, and I exaggerated.

13 Q   Okay, so he did or he didn't hit you with a humidifier?

14 A   He did not.

15 Q   But you told the officers he did, right?

16 A   Yes.

17 Q   What else did you tell the officers he hit you with?

18 A   I told them that he hit me with a flashlight.

19 Q   And did he?

20 A   No.

21 Q   Uh-huh, what else did you tell them?

22 A   Told them that he hit me with a (indiscernible).

23 Q   And did he?

24 A   (Indiscernible)

25 Q   What else did you tell them?

## Page 21

1 A   That was it.

2 Q   Why did you lie to the officers?

3 A   Well, I wanted revenge, I mean, I had -- I was very tired,

4      very frustrated, I was under a lot of pressure, and didn't

5      want to deal with him, and I felt that the only way to get

6      rid of him is to call the police.

7 Q   And you also thought you had to lie to get rid of him?

8      Couldn't you have just told the truth?

9 A   (No audible response)

10 Q   Now, was there any blood on your clothing from this

11     incident?

12 A   It was dark.

13 Q   Well, when you went over to your other sister's house did

14     you see any blood on your clothing?

15 A   Yes.

16 Q   And did you give those clothes to the police officers?

17 A   They -- they demand that I give them to them.

18 Q   And so you did?

19 A   I didn't feel I have to but (indiscernible) necessary.

20 Q   Did you go the doctor about the cuts on your head?

21 A   They demand that I did.

22 Q   And so did you?

23 A   They demand that I did.

24 Q   So you did?

25 A   The officer gave me money so that he made sure I went to

Case 4:03-cv-00013-RRB Document 59-22 Filed 05/25/2006 Page 8 of 21

| | Page 22 | | | Page 24 |
|---|---|---|---|---|
| 1 | the hospital, I didn't feel it was very necessary. | 1 | A | Well, of course, you know, just..... |
| 2 Q | They were concerned about how hurt you were, though, | 2 | Q | That's what you told the officers, though, isn't it? |
| 3 | weren't they? | 3 | A | You know, he brags so much about the gun that when |
| 4 A | They more so demand that I went. | 4 | | when I heard noises, the sound of a bag, I assumed that he |
| 5 Q | Now, in your discussions with the officers did you tell | 5 | | had the gun. I overreact. |
| 6 | them that you thought Mr. Simmons was still over at the | 6 | Q | Now, this incident that you told the officers about, you |
| 7 | house? | 7 | | hadn't previously reported that to the police, correct? |
| 8 A | Yeah. | 8 | A | No. |
| 9 Q | All right, now, in that interview with Officer Hodges you | 9 | Q | Why not? |
| 10 | mentioned a prior assault to him, didn't you? | 10 | A | Must I answer this? |
| 11 A | No, I -- that is not relevant. It's not the reason why I | 11 | Q | Uh-huh (affirmative). |
| 12 | am here. That -- it is a carry on to..... | 12 | A | Well, I -- I didn't. |
| 13 Q | This is a question. You may not believe it's relevant, | 13 | Q | Why didn't you report it? |
| 14 | but I'm asking the question, you're required to answer | 14 | A | Didn't think it was necessary. |
| 15 | because you're under oath. Did you tell the officer about | 15 | Q | Now, this incident that we just talked about over at his |
| 16 | a prior assault? | 16 | | house, that happened approximately September 4th, is that |
| 17 A | They asked me. | 17 | | -- is that correct? |
| 18 Q | Okay, and did you tell them about it? | 18 | A | I don't recall. |
| 19 A | They wanted to know. | 19 | Q | About how long before the September 26th incident? A |
| 20 Q | Uh-huh, and what'd you tell them? | 20 | | couple of weeks? |
| 21 A | They suggested I tell them everything. I say it is not | 21 | A | Three, four weeks. (Indiscernible) |
| 22 | relevant, it is not -- and it's not..... | 22 | | MS. PARKES: I don't have any further questions for this |
| 23 Q | Okay, but did you tell them that he had held a gun to your | 23 | | witness. Do any of the grand jurors have any questions? Yes, |
| 24 | head a couple of weeks before? | 24 | | ma'am. |
| 25 A | Yes. | 25 | | BY UNIDENTIFIED JUROR: |

| | Page 23 | | | Page ... |
|---|---|---|---|---|
| 1 Q | And this happened over at his house, is that correct? It | 1 | Q | I was just wondering if you were -- were still seeing Mr. |
| 2 | happened at his residence? | 2 | | Simmons? |
| 3 A | Yes. | 3 | | BY MS. PARKES: |
| 4 Q | And didn't you tell the officers that he had had a friend | 4 | Q | Are you still in contact with Mr. Simmons? |
| 5 | of his, Mr. Herrera, bring the gun over? | 5 | A | He's in jail. |
| 6 A | Yes. | 6 | | MS. PARKES: I'm going to ask that you disregard that for |
| 7 Q | And didn't you say that Mr. Herrera brought it over in a | 7 | | purposes of any inference from the fact that he's in jail and |
| 8 | bag? | 8 | | only use that in assessing whether they're in contact or not. |
| 9 A | Yes. | 9 | | Can everybody disregard the prejudicial effect of the fact that |
| 10 Q | Didn't you tell them that Mr. Simmons held the gun to your | 10 | | he might be in jail? All right, I see no hands of anyone |
| 11 | head and threatened you with it? | 11 | | indicating they cannot. |
| 12 A | I don't remember. | 12 | Q | Have you been in contact with him while he's been in jail? |
| 13 Q | But he did put the gun to your head? | 13 | A | No. |
| 14 A | I don't remember. | 14 | Q | You haven't called him? |
| 15 Q | Okay, let's take a look at your statement. Would you like | 15 | A | I've gone to visit him but I couldn't get to see him, I |
| 16 | to review your statement? | 16 | | needed an ID and I didn't have that time, so |
| 17 A | No. | 17 | | (indiscernible). |
| 18 Q | Okay, well, didn't you tell the officer, he dragged me | 18 | | MS. PARKES: Anybody else have any other questions? Okay, |
| 19 | into the bedroom and put the gun to my head? Do you | 19 | | you can be excused at this time. I'm going to bring Officer |
| 20 | remember saying that? | 20 | | Hodges in. If you'd stand and raise your right hand and be |
| 21 A | Yes, it was dark in the bedroom, I -- I only assumed that | 21 | | sworn in. |
| 22 | he did. | 22 | | (Oath administered) |
| 23 Q | Did you tell him that it's a 44 -- caliber 44 gun? | 23 | | OFFICER HODGES: Yes, I do. |
| 24 A | I assume I did. | 24 | | JOHN HODGES, |
| 25 Q | Uh-huh, and that he brags about that gun all the time? | 25 | | called as a witness, testified as follows on: |

## Page 26

DIRECT EXAMINATION

BY MS. PARKES:

1  Q   For the record would you please state your name and spell

2      your last name?

5  A   John Hodges, H-O-D-G-E-S.

6  Q   And your business or mailing address?

7  A   Bethel Police Department, Post Office Box 500.

8  Q   And occupation?

9  A   Police Officer for the City of Bethel.

10 Q   Officer Hodges, did you become involved in an

11     investigation on September 26th, 1990, regarding a David

12     Simmons?

13 A   Yes, I did.

14 Q   And can you tell us when you first got involved in that,

15     how that occurred?

16 A   It started off on the 25th at about 6:00 p.m. Elaine

17     Aloysius called the police department and said that there

18     was a man in that house she wished to have removed and she

19     was at 119 Atsaq Street.

20 Q   And was that her normal address?  Did she tell you it was

21     her sister's?

22 A   She said it was her sister's house, she was staying there

23     at least temporarily.

24 Q   And did you go over to that address?

25 A   Yes, I did.

## Page 27

1  Q   And what did you find when you got there?

2  A   I found David Simmons and Elaine Aloysius inside the

3      house.  Elaine had told me that she just wanted him to

4      leave and so I asked Mr. Simmons to leave and he left.

5  Q   After he left did Ms. Aloysius indicate to you whether he

6      had forced his way in or if she had voluntarily let him

7      in?

8  A   She told me that he kicked the door open.

9  Q   And did she show you any evidence of that?

10 A   Yeah, part of the door frame was cracked.

11 Q   And you observed that?

12 A   Yes.

13 Q   What happened after that?  Did you leave?

14 A   Yes.

15 Q   Okay, were you called back regarding another incident with

16     Mr. Simmons that night or early the next morning?

17 A   Yes.

18 Q   Can you tell us how that occurred?

19 A   Again Elaine Aloysius called the police department.

20 Q   About what time was this call?

21 A   I believe it's around 2:00 a.m.

22 Q   Okay, and did you go to her location?

23 A   Yes, at 121 Ptarmigan Street.

24 Q   And when you arrived there what did you observe about her?

25 A   She had a great deal of blood in her hair and blood on her

## Page 28

1      clothes.

2  Q   How did she seem?  What was her demeanor?

3  A   Well, she seemed very scared, she said she'd been

4      assaulted.

5  Q   What did she -- did she tell you who had assaulted her?

6  A   Yes, David Simmons.

7  Q   And not at this time but later did you interview her at

8      the police department?

9  A   Yes, I did.

10 Q   And what -- in detail what exactly did she tell you had

11     occurred that night?

12 A   That Simmons had again broken into or kicked the door open

13     at 119 Atsaq Street, and went in the house, choked her,

14     hit her on the head with various objects, and.....

15 Q   Specifically did she mention a baby swing?

16 A   Yes, she did.

17 Q   What did she say occurred with the baby swing?

18 A   She said that he had strangled her with that.

19 Q   She indicate whether he used a flashlight?

20 A   I'd have to refer to the report.

21 Q   Okay, how about a humidifier, do you recall that?  If it

22     would help you to refer to your report, why don't you.....

23 A   Yes.

24 Q   Okay, please do.

25 A   Okay.

## Page 29

1  Q   Specifically on Page 5 I believe there's -- of her

2      interview reference to the humidifier.  Does that refresh

3      your memory?

4  A   Yes, she did say that Simmons had picked up a humidifier

5      and hit her over the head with it while she was sitting on

6      the couch.

7  Q   Did she also say anything about a telephone?

8  A   Yes, that Simmons also hit her over the head with the

9      telephone.

10 Q   Did she indicate whether he was making any threats to her

11     at that time?

12 A   She said he was threatening to kill her.

13 Q   After speaking to her briefly at the other residence did

14     she indicate to you where she thought Mr. Simmons was?

15 A   Yes, she -- well, she believed that he might still be at

16     119 Atsaq Street.

17 Q   And did you go over there?

18 A   Yes.

19 Q   And did you go over there alone or (indiscernible)?

20 A   With other officers.

21 Q   And what did you find when you got to the residence?

22 A   Found David Simmons apparently asleep on the couch in the

23     living.

24 Q   And did you place him under arrest?

25 A   Yes.

## Page 30

1 Q   Did you make any observations while you were in the house
2    at that time?
3    (End of side 1)
4 A   There was a great deal of blood on the floor.
5 Q   Did you make any observations about Mr. Simmons' clothes,
6    whether he may have had blood on his clothes?
7 A   Yes, there appeared to be some blood stains on his pants.
8 Q   Now, when you interviewed Elaine regarding this incident
9    did she also tell you about another incident?
10 A   Yes.
11 Q   Did she indicate about what time that other assault had
12    occurred time-wise?
13 A   About three weeks prior.
14 Q   Had that assault ever been reported before that time, to
15    your knowledge?
16 A   No.
17 Q   And did she tell you that during that assault he had
18    pointed a gun at her head.....
19 A   Yes.
20 Q   .....and threatened to kill her?
21    MS. PARKES: I don't have any other questions for Officer
22    Hodges. Do any of the grand jurors have questions?
23    UNIDENTIFIED JUROR: I do.
24    MS. PARKES: Yes, sir.
25    BY UNIDENTIFIED JURORS:

## Page 31

1 Q   Could you comment on her state of feeling during your
2    interrogation?
3 A   She seemed very upset by the whole thing.
4 Q   Would you describe it as fear or anger?
5 A   More as fear.
6    MS. PARKES: Answer your question? Any -- anyone else?
7    Yes, ma'am.
8 Q   Was there alcohol involved?
9 A   Simmons appeared to be intoxicated, yes. Ms. Aloysius,
10    she did not appear to be intoxicated.
11    MS. PARKES: Yes, ma'am.
12 Q   The first time you were called I believe to the sister's
13    house were there -- were there several people in -- at
14    that house or.....
15 A   Now is this on the 25th where -- the first time I go
16    there?
17 Q   Yes.
18 A   No, it was just Elaine -- Elaine Aloysius and David
19    Simmons. That's the only -- I didn't go throughout the
20    house, but those were the only two people I saw.
21    MS. PARKES: Anybody else? Okay, I see no more hands, no
22    more questions. You can be excused, Officer. I'm going to call
23    Officer Bilyeu. If you'd raise your hand and be sworn in.
24    (Oath administered)
25    OFFICER BILYEU: I do. It's warm in here.

## Page 32

1    MS. PARKES: It's very warm in here.
2    JOHN BILYEU,
3 called as a witness, testified as follows on:
4    DIRECT EXAMINATION
5 BY MS. PARKES:
6 Q   If you could state your name for the record and spell your
7    last name, please?
8 A   John Bilyeu, B-I-L-Y-E-U.
9 Q   And your business or mailing address?
10 A   P. O. Box 500, Bethel, Alaska.
11 Q   And your occupation, sir?
12 A   Police sergeant.
13 Q   Okay, Sgt. Bilyeu, were you involved in an investigation
14    of an assault with the suspect being David Simmons back in
15    September 25th, 26th?
16 A   Yes.
17 Q   And pursuant to that investigation did you observe the
18    victim, Elaine Aloysius, on September 26th?
19 A   Yes.
20 Q   What -- can you tell us what observations you made about
21    any injuries and her demeanor?
22 A   Well, she was highly distressed, hysterical. She had told
23    us that she'd been assaulted and she felt like her life
24    was in danger, that she thought she was going to be
25    killed. She had blood running down the back of her neck

## Page

1    from her head, her head was very bloody. She had blood on
2    her clothing and those were the -- the obvious injuries.
3 Q   And did you seize her clothing from her?
4 A   Yes, and she also, if memory serves me correctly, had a
5    bruise on her face, and later she showed me a couple of
6    other injuries that had occurred a few weeks before.
7 Q   And did you suggest to her that she go to the hospital or
8    to the doctor's?
9 A   Yes, we were kind of short-handed at that time and -- and
10    she had advised us the suspect was still in her residence,
11    and so we called a cab and I gave her cab fare to go to
12    the hospital and told her to get treatment and wait there
13    'til we arrived.
14 Q   Did she seem to object to going to the hospital?
15 A   No, she was anxious to go.
16 Q   And did you go over to the residence and place Mr. Simmons
17    under arrest?
18 A   Yes, Officer Hodges and I did.
19 Q   And did you observe any blood on Mr. Simmons' clothing?
20 A   Yes, he had very obvious blood stains on -- on the front
21    and the back of his pants.
22 Q   Did you eventually also, Sgt. Bilyeu, seize some evidence
23    from that residence?
24 A   Yes, after we made the arrest and completed the -- some
25    initial interviews, we went to the residence and took

Page 34

1    photographs and -- and seized some evidence.
2 Q  Can you tell us what it was that you seized that she had
3    indicated had been used to assault her?
4 A  We seized a flashlight that was laying on the floor in the
5    living room that had been used -- actually the
6    kitchen/living room area. A -- we didn't seize a
7    humidifier, but we took a photograph. It was a large room
8    humidifier that was very light-weight and she said that he
9    had hit her on the head with that. We did seize a baby
10   cribseat that had a clamp hung on that she'd indicated
11   he'd struck her with, and also that he's used the tongs to
12   try and choke her.
13 Q Did you make any observations, then, of any blood stains
14   on that baby jumper seat?
15 A There was blood stains all over it, there was blood stains
16   on the crib, on the crib bedding, and on the floor next to
17   the crib, and we took photographs of -- of the blood
18   stains.
19   MS. PARKES: All right, I don't think I have any other
20 questions of Sgt. Bilyeu. Do any of the grand jurors have
21 questions? Okay, I see no hands, you may be excused, Officer.
22 We have one other witness. I'd like to take a short break
23 before I present him and he will be my last witness. So it's
24 noon right now, if you could take a 10-minute break until 12:10.
25 Don't deliberate or talk about the case, and then we'll come

Page 35

1    back on and finish up. We can go off record.
2    (Off record)
3    MS. PARKES: Okay, we're back on record in State of Alaska
4 versus David Simmons, it's 12:07, we took a brief break. I
5 assume no deliberations occurred while we were off record, Madam
6 Foreperson? Is that correct? Thank you. I have Sgt. Bilyeu
7 still on the stand, there's a couple questions I had meant to
8 ask him and overlooked.
9                  JOHN BILYEU,
10 previously sworn, called as a witness, testified as follows on:
11              DIRECT EXAMINATION CONTINUED
12 BY MS. PARKES:
13 Q Sgt. Bilyeu, in the interview -- or, the information that
14   the police received from the victim in this case, she --
15   she had indicated there had been a previous assault, is
16   that correct?
17 A Yes, about three weeks prior.
18 Q And that assault had occurred when a friend of Mr.
19   Simmons had brought a weapon over to his house?
20 A Yes, she stated that Manny Herrera had brought a 44
21   revolver over and that Mr. Simmons had taken her back in
22   the bedroom, pointed the gun at her head and she could
23   tell it was loaded because she could see the bullets in
24   the chamber, and he'd threatened to kill her. And that he
25   -- when had left the bedroom -- I think this occurred in

Page 36

1    the bedroom and Mr. Herrera wasn't inside the bedroom at
2    the time, but then he went back out, gave the gun to Mr.
3    Herrera and Mr. Herrera took the gun back to his house.
4    She indicated that that night while she was being
5    assaulted Mr. Simmons had called Mr. Herrera and asked him
6    to bring the gun over again.
7 Q  This was the second incident?
8 A  The second incident.
9 Q  Now, pursuant to that information about the weapon Mr.
10   Herrera had given to Mr. Simmons did you get a search
11   warrant for Mr. Herrera's house?
12 A  Yes, I'd had a previous case which was involving Mr.
13   Simmons and a weapon that was several described.....
14   MS. PARKES: Okay, I'm going to ask that the grand jury
15 disregard that last comment about any prior incident with Mr.
16 Simmons and any weapon. You need to just look at the evidence
17 in this case and not consider whether Mr. Simmons has had any
18 previous cases or any previous weapons problems. Can anyone not
19 disregard that last comment? Okay, I see no hands.
20 Q  If you can just tell us if you got the search warrant and
21   if you served it?
22 A  Yes, I received a search warrant at 3:38 in the morning on
23   September 26th.
24 Q  And what did you do with it?
25 A  We served the search warrant, went over to Mr. Herrera's

Page 37

1    house and served the search warrant at 4:04 a.m. on the
2    26th.
3 Q  And did you find a weapon that met the description of the
4    weapon used in the assault?
5 A  Yes, once we get -- got into Mr. Herrera's house I advised
6    him what we were looking for and that we could save a lot
7    of searching and everything if he would just tell us where
8    the weapon was that we were looking for and he pointed to
9    a box and said it's in that box.
10 Q  And what was the weapon that you seized?
11 A  It was a 44-magnum revolver, Virginia Dragoon single-
12   action revolver, and the serial number was S21996.
13   MS. PARKES: All right, thank you, Sgt. Bilyeu. I have no
14 further questions of Sgt. Bilyeu. Any grand jurors have any
15 questions based on this testimony? Okay, you may be excused.
16 I'll call Mr. Herrera. Just step up there and -- by the
17 microphone up here, and if you'll remain standing and raise your
18 right hand and your foreperson will swear you in.
19   MR. HERRERA: Just stand here?
20   MS. PARKES: Yes, that's fine. Go ahead and raise your
21 right hand.
22   MR. HERRERA: Okay.
23   (Oath administered)
24   MR. HERRERA: Yes.
25              JOSE HERRERA,

## Page 38

1 called as a witness, testified as follows on:
2          DIRECT EXAMINATION
3 BY MS. PARKES:
4 Q   For the record would you please state your -- go ahead and
5       sit down. We're recording this so.....
6 A   Okay.
7 Q   For the record if you'd please state your full name and
8       spell your last name?
9 A   My name is Jose Manuel Herrera, my last name is H-E-R-R-E-
10      R-A.
11 Q   And your mailing address?
12 A   P. O. Box 1832, Bethel.
13 Q   Okay, occupation?
14 A   Right now I'm not employed.
15 Q   Okay, Mr. Herrera, do you sometimes go by the name Manny?
16 A   Yes, I do.
17 Q   And do you know David Simmons?
18 A   Yes.
19 Q   How do you know David Simmons?
20 A   I used to take care of him when he first came up here back
21      in '82.
22 Q   Okay, so you met him back in 1982?
23 A   Yeah.
24 Q   Okay, and so you've known him eight years?
25 A   Well, he's -- he was in prison so he was kind of away for

## Page 39

1    a while, so.....
2    MS. PARKES: Okay, I'm going to ask.....
3 A   .....I couldn't say eight years.
4    MS. PARKES: Okay, I'm going to ask the grand jurors to
5 disregard the comment that he had been in prison. Anyone who
6 can't disregard that comment? All right, I see no hands.
7 Q   Do you consider Mr. Simmons a friend?
8 A   Pretty much so.
9 Q   Now, do you remember the officers, Sgt. Bilyeu and Officer
10     Hodges, I believe, coming to your house in the early
11     morning hours of September 26th and asking you about a
12     gun?
13 A   They were -- I -- I recall when they came in what they
14     broke my door down, okay.
15 Q   And they had a warrant served at your house for a gun, is
16     that correct?
17 A   Yes, but they didn't have permission to break my door
18     down.
19 Q   All right. And did you give to them a gun?
20 A   Yes, a gun that I bought from.....
21 Q   And who had you bought the gun from?
22 A   From Mr. Simmons.
23 Q   And can you describe the gun to us?
24 A   It's a -- it's a 44-caliber, silver and with a brown
25     handle. Yeah, I bought that gun from him.

## Page 40

1 Q   When did you buy it from him?
2 A   Somewhere between May and June.
3 Q   Of 1989, or 1990?
4 A   Of this.....
5 Q   This year?
6 A   .....year.
7 Q   Now, sometime in September did Mr. Simmons call you and
8       ask you to bring the gun over to his house?
9 A   I don't recall him calling and telling me to bring a gun
10      over.
11 Q   Do you remember.....
12 A   As a matter of fact I never brought the gun there to his
13      house, you know, because he -- he told me back in the
14      month of June, I believe, or between May and June that --
15      that once he was sentenced that he could no longer possess
16      a pistol, and that he was considered a felon, so I decided
17      to buy it from him from there.
18 Q   Okay, well, do you recall ever taking the gun over to his
19      house in September?
20 A   No.
21 Q   Okay, do you remember the officer, Sgt. Bilyeu, asking you
22      about whether that had happened?
23 A   Oh, they were asking me a lot of questions when they came
24      in that time, but I was not in a right state of mind, I --
25      because we were drinking and sort of smoking.

## Page

1 Q   Smoking marijuana?
2 A   Sort of, you know, it's a small bag is all.....
3 Q   Well, you were or you weren't.
4 A   Yeah. So, like I said, I was not in a right state of mind
5       and -- but I -- I never came there with a gun.
6 Q   Okay, Mr. Herrera.....
7 A   You know.
8 Q   .....did you get a chance to review the statement you made
9       with the police?
10 A   Yes.
11 Q   Okay. And do you remember Sgt. Bilyeu saying do you
12      recall him phoning you and asking you to bring the gun
13      over and you brought it over in a bag, he wielded it for a
14      while and then gave it back to you and you went home? Do
15      you remember that occurring? You say you don't remember.
16      He said, it's not alleged that you participated in the
17      assault, it's alleged that you brought it over. You said,
18      yeah. And he said, and then he took it -- you took it
19      away, do you remember that? And you said yeah. Did you
20      make those statements? Do you remember saying that
21      (indiscernible).....
22 A   I don't remember saying those things.
23 Q   You don't remember saying that to.....
24 A   No.
25 Q   .....the officer? You've had a chance to review the

## Page 42

1    transcript, is that.....

2  A   Yes.

3  Q   .....correct?

4  A   But they been trying to put words in my mouth to say this

5      and that, and, you know, I don't like people putting words

6      in my mouth.

7      MS. PARKES: All right, Mr. Herrera, I don't have any

8  further questions for you. Do the grand jurors have any further

9  questions?

10 BY UNIDENTIFIED JURORS:

11 Q   You're sure? Just to repeat. You're sure you didn't take

12     it over?

13 A   Yes. Because once I bought it I always had it in my

14     house, you know, I -- I wouldn't just bring it there to

15     him because I know -- he knows -- he knows he can't be

16     around it. He -- he'll go to jail. He knows that. He's

17     a smart man, he shouldn't -- he's older than me, so he

18     should know. He should know more, you know.

19     MS. PARKES: Anybody else have any questions? Okay, Mr.

20 Herrera, you can be excused -- oh, I'm sorry.

21 Q   I had one, I think you answered it at the -- at the

22     beginning when she asked if -- if you were good friends or

23     something you took -- you said you took care of him? But

24     then (indiscernible, simultaneous).....

25 A   Yeah, right from the beginning because he -- he didn't

## Page 43

1      have a place to stay.....

2  Q   I see.

3  A   .....you know.

4      MS. PARKES: Yeah, I think his answer (indiscernible).

5  Q   Okay. I thought maybe he was ill or something.

6  A   Oh, that's -- no, he just didn't have a place to stay, you

7      know, it's -- because there were too many drunks at the

8      time, and he couldn't -- it was too noisy and just liked a

9      quiet place, so I took him in.

10     MS. PARKES: Anybody else. Okay, Mr. Herrera.....

11 A   I mean, they can ask me questions, you know.

12     MS. PARKES: I don't see anybody who has any questions.

13 A   Well, you know.

14     MS. PARKES: All right, you can -- if you can just wait

15 there in case they think of some, you can just wait outside.

16 Thank you for coming down.

17 A   Okay. I mean, you know, you want me to wait out there or

18     something?

19     MS. PARKES: Please. Okay, those are all the live

20 witnesses I have to present. I am going to move into evidence

21 two grand jury exhibits, A and C. These are certified copies of

22 convictions of Mr. Simmons showing that he has had prior

23 convictions for a felony offense. I'm moving these into

24 evidence simply for the purposes of showing the one element of

25 the misconduct involving weapons, that he has a prior felony

## Page 44

1    conviction. You're instructed that you should not use the fact

2    that he has a prior felony conviction against him in any way in

3    the case except to help you deliberate in finding whether the

4    State has shown you enough evidence on that count. So I will

5    move those into evidence.

6        I'm also going to give you one final instruction, given

7    the way that the evidence has come out in this case. You should

8    be aware that you can use prior inconsistent statements of

9    witnesses as substantive evidence. What that means is Ms.

10   Aloysius came in here and Mr. Simmons (sic) came in here and

11   told you something different than what they told the police, I

12   didn't say that or I don't remember that or I was lying. You

13   can choose to believe what they told you on the stand, or you

14   can choose to believe what they told the officers at the time

15   their statements to the officers were made. That is a

16   credibility judgment for you, and if you find that they weren't

17   telling you the truth here in grand jury, you can rely on their

18   prior statements in deciding this case. If you find that what

19   they told you in grand jury was the truth, then you rely on

20   their statements there. But I just want you to know that under

21   the law prior inconsistent statements of a witness can be used

22   as substantive evidence, that's a credibility judgment for you,

23   the grand jurors.

24       Does anyone have any questions of me, do you want to hear

25   from any of the other witnesses again?

## Page 45

1        UNIDENTIFIED JUROR: I wanted to ask when you gave us the

2    definitions that had to do with the -- I think it was the fourth

3    count.....

4        MS. PARKES: Okay.

5        UNIDENTIFIED JUROR: .....what -- the way I heard it it

6    was if he had in his possession or has on him a concealable

7    weapon.

8        MS. PARKES: Weapon, that's correct.

9        UNIDENTIFIED JUROR: That doesn't mean that it's

10   concealed, though, right?

11       MS. PARKES: Correct. As a felon he cannot possess a

12   weapon capable of being of concealed.

13       UNIDENTIFIED JUROR: By possession, that would mean just

14   touching it?

15       MS. PARKES: Possess would mean more than just merely

16   touching it. You would have to have some amount of control over

17   the weapon. A lot of times there -- there's an instruction in

18   law that it has to be more than fleeting possession. It would

19   probably have to be more than me handing Mr. Simmons a gun, Mr.

20   Simmons handing the gun to you. You have to find some amount of

21   control over that weapon. Any other questions about the law or

22   some statutes or any other evidence that you think you might

23   like to hear?

24       UNIDENTIFIED JUROR: I got a problem, I guess, with the --

25   maybe I can just ask you about the -- we've been instructed

Page 46

1 previously that in -- you know, where there's -- there is no
2 controverting evidence. Now, this case we've obviously got
3 controverting.....
4     MS. PARKES: Sure.
5     UNIDENTIFIED JUROR: .....issues. And, you know, we're
6 not Job; the question of who's lying, really. What -- what is
7 the appropriate finding in that? Is that.....
8     MS. PARKES: It's going to be -- it's -- that's something
9 that you as a grand jury are going to have to deliberate and
10 decide for yourself. Yeah, the instruction is if you find,
11 based upon the all -- all the evidence if it was uncontroverted
12 or unexplained, would it result in -- in enough for beyond a
13 reasonable doubt.
14     In this case, yeah, it's going to be a little tougher
15 because you've heard some conflicting evidence, and that is
16 really something that each of you are going to have to decide
17 for yourself who you believed, what -- what evidence you think
18 is credible. And you should look at each of the counts
19 separately and the evidence as to each of the counts and find
20 whether there's enough evidence for you to return a true bill as
21 to each count. And that's -- that's really something I can't
22 advise you on.
23     UNIDENTIFIED JUROR: Okay.
24     MS. PARKES: Any other questions? I will -- just to
25 elaborate on that. The instruction that you'd be given as a

Page 47

1 trial jury would be that you can look at many things in deciding
2 what you're going to believe. You look at the demeanor of the
3 witness on the stand, any motive they might have to lie, any
4 interest they have in the outcome of the case, their ability to
5 perceive, all of those things can go in your determination of --
6 of what you're going to believe. Yes, sir.
7     UNIDENTIFIED JUROR: Just to make sure that I understood,
8 when you asked him the question about in September whether he
9 had given the gun to Simmons, he -- that was the time -- this
10 was the incident where your -- this was the possession of
11 weapons.....
12     MS. PARKES: Right, over at his house.
13     UNIDENTIFIED JUROR: Over at his house.
14     MS. PARKES: Correct.
15     UNIDENTIFIED JUROR: That was the September 5th.....
16     UNIDENTIFIED JUROR: Right, that was September.....
17     UNIDENTIFIED JUROR: Yes.
18     MS. PARKES: The earlier in September she -- when she told
19 the officers that he had brought it over, he had pointed it at
20 her, and then the friend took the gun away.
21     UNIDENTIFIED JUROR: Did you ask him the question about
22 whether he had asked him to bring a gun over in that -- the
23 assault, the beating time?
24     MS. PARKES: I don't believe I did. Would you like to
25 have that question asked?

Page 48

1     UNIDENTIFIED JUROR: Well. just to refresh my memory, I'm
2 trying to remember, when did this come up about him -- who
3 told -- who said that Simmons called this guy, Herrera, to bring
4 the gun over?
5     MS. PARKES: I believe it was Sgt. Bilyeu, and correct me
6 if I'm wrong. I believe it was Sgt. Bilyeu's testimony in
7 telling what Elaine had told them, this.....
8     UNIDENTIFIED JUROR: Oh, Elaine said that Simmons had
9 called Herrera to have him bring the gun over?
10     MS. PARKES: During the second assault.
11     UNIDENTIFIED JUROR: While she was relating the first
12 incident?
13     MS. PARKES: Yes.
14     UNIDENTIFIED JUROR: Is it.....
15     MS. PARKES: Do you want to hear from anyone to clarify
16 this?
17     UNIDENTIFIED JUROR: I just -- I just wanted to
18 establish.....
19     MS. PARKES: Where that came from?
20     UNIDENTIFIED JUROR: Yes, just where.....
21     MS. PARKES: I just.....
22     UNIDENTIFIED JUROR: .....all this came from.
23     MS. PARKES: My understanding of Sgt. Bilyeu's testimony,
24 and if my memory's different than yours, rely on yours or we can
25 hear from him, is that when they were called to the September

Page

1 25th/26th incident she told them that there had been a previous
2 incident where he had pointed the gun at her head, but she'd
3 also said that during the September 25th/26th incident he had
4 also made a phone call asking Mr. Herrera to bring the gun over.
5     UNIDENTIFIED JUROR: And we haven't asked Herrera about
6 that?
7     MS. PARKES: No. Would you like to have -- maybe I should
8 -- should leave you to deliberate and if you decide you can --
9 you can decide on the indictment, or if you want to hear from
10 any other witnesses you can let me know that too. All right,
11 any other questions before I leave you? Okay, it's 12:26, we're
12 going to go off record.
13     (Off record)
14     MS. PARKES: Okay, we're back on record in State of Alaska
15 versus David Simmons, it's approximately 12:43 -- wait, 45, 6,
16 7, 8. 12:48. Did you reach a decision or do you have a
17 question?
18     FOREPERSON: We reached decisions.
19     MS. PARKES: Okay, can you tell us what those were? As to
20 Count I on the indictment?
21     FOREPERSON: True bill.
22     MS. PARKES: Okay, and as to Count II?
23     FOREPERSON: True bill.
24     MS. PARKES: Okay, as to Count III?
25     FOREPERSON: True bill.

Case No. 4BE-S90-0552 CR                    CondenseIt!™                    State v. SIMMONS

Page 50

1    MS. PARKES: And as to Count IV?

2    FOREPERSON: True bill.

3    MS. PARKES: And did a majority concur in that?

4    FOREPERSON: Yes.

5    MS. PARKES: Okay, and were each of them voted on

6    separately?

7    FOREPERSON: Yes.

8    MS. PARKES: Okay. I will then withdraw the exhibits and

9    we can go off record and sign the indictment.

10    (Off record)

11          END OF REQUESTED PORTION

12          * * * * *

13

14

15

16

17

18

19

20

21

22

23

24

25

Pg. 184, Exhibit 21,

TRANSCRIBER'S CERTIFICATE

1

2      I, Teresa E. Mielke, hereby certify that the foregoing

3  pages numbered 2 through 50 are a transcript of grand jury

4  proceedings in Case No. 4BE-S90-0552 CR, State versus Simmons,

5  transcribed by me from reformatted single channel copies of

6  four-channel analog sound recordings to the best of my knowledge

7  and ability.

8

9  September 19, 2005                    
                                   Teresa E. Mielke, Transcriber

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GEMINI
Reporting Services
943 West 6th, Suite 110
Anchorage, Alaska 99501
277-8591
Fax 272-9258

· 51

Case No. 4BE-S90-0552 CR   Pg. 190   CondenseIt!   Exhibit #21   '82 - considered
State v. SIMMONS

---

**-'-**

'82 [1] 38:21
'89 [2] 11:17,18
'til [1] 33:13

**-1-**

1 [1] 30:3
10-minute [1] 34:24
11.41.210 [1] 5:20
11.41.220 [1] 6:14
11.46.300 [1] 4:13
11.61.200 [1] 7:10
119 [5] 2:15 11:25 26:19
28:13 29:16
11:05 [1] 2:4
11:19 [1] 10:6,8
11:21 [1] 10:19
121 [2] 14:22 27:23
12:07 [1] 35:4
12:10 [1] 34:24
12:26 [1] 49:11
12:43 [1] 49:15
12:48 [1] 49:16
17 [2] 4:9,10
1832 [1] 38:12
1982 [1] 38:22
1989 [1] 40:3
1990 [8] 2:13,19 3:2,9
8:21 11:23 26:11 40:3

**-2-**

2104 [1] 11:7
25th [3] 26:16 31:15
32:15
25th/26th [1] 49:1,3
26th [11] 2:12,18 8:21
11:23 24:19 26:11 32:15
32:18 36:23 37:2 39:11
2:00 [1] 27:21

**-3-**

3:38 [1] 36:22

**-4-**

44 [3] 23:23,23 35:20
44-caliber [1] 39:24
44-magnum [1] 37:11
45 [1] 49:15
4:04 [1] 37:1
4BEGJ-464 [1] 2:2
4th [4] 3:1,8 9:19 24:16

**-5-**

5 [1] 29:1
500 [2] 26:7 32:10
5th [1] 47:15

**-6-**

6 [1] 49:15
6:00 [1] 26:16
6:30 [1] 15:17

**-7-**

7 [1] 49:16

**-8-**

8 [1] 49:16

**-9-**

99559 [1] 11:7

**-A-**

A-L-O-Y-S-I-U-S [1]
11:5
a.m [2] 27:21 37:1
ability [1] 47:4
act [2] 5:10 6:8
acting [1] 5:24
action [1] 37:12
acts [5] 5:10 6:23 7:7,16
7:25
address [6] 11:6 26:6,20
26:24 32:9 38:11
administered [4] 10:22
25:22 31:24 37:23
advise [1] 46:22
advised [2] 33:10 37:5
afternoon [1] 13:12
again [10] 2:3 5:24 9:6
10:15,15 14:8 27:19 28:12
36:6 44:25
against [2] 2:7 44:2
ahead [3] 17:21 37:20
38:4
Alaska [10] 2:4,14,20 3:3
3:10 4:13 11:7 32:10 35:3
49:14
alcohol [1] 31:8
alleged [2] 41:16,17
alone [2] 14:19 29:19
Aloysius [24] 2:15,21
3:4,16 8:20,21 9:2,7,18
10:5,11,11,12,23,24 11:5
26:17 27:2,5,19 31:9,18
32:18 44:10
always [1] 42:13
amount [2] 45:16,20
Anchorage [1] 2:6
anger [1] 31:4
answer [8] 12:25 18:3,5
18:6 22:14 24:10 31:6
43:4
answered [1] 42:21
answering [1] 18:2
anxious [1] 33:15

apologize [1] 10:14
appear [1] 31:10
appeared [2] 30:7 31:9
apply [1] 4:11
appropriate [1] 46:7
area [1] 34:6
argument [3] 18:25
19:12,13
arrangements [1] 12:10
arrest [3] 29:24 33:17,24
arrested [1] 9:16
arrived [2] 12:18 27:24
33:13
asleep [5] 9:15 15:22,23
16:15 29:22
assault [23] 2:9,9,16 5:20
5:21 6:13,15,22 9:17,19
22:10,16 30:11,14,17
32:14 34:3 35:15,18 37:4
41:17 47:23 48:10
assaulted [6] 9:7,8 28:4
28:5 32:23 36:5
assessing [1] 25:8
assistant [1] 2:5
assume [2] 33:24 35:5
assumed [2] 23:21 24:4
Atsaq [5] 2:15 11:25
26:19 28:13 29:16
attempted [2] 6:5,19
attend [1] 15:6
attorney [2] 2:6 13:15
audible [2] 17:15 21:9
audibly [1] 12:25
August [1] 11:16
authorized [2] 5:17 8:9
automatically [2] 16:6
17:3
AVCP [2] 11:9,12
aware [6] 6:25 7:7,18,21
7:25 44:8
away [4] 9:15 38:25 41:19
47:20

**-B-**

B [1] 2:17
B-I-L-Y-E-U [1] 32:8
baby [6] 23:2 9:9 28:15
28:17 34:9,14
background [1] 3:22
bag [4] 23:8 24:4 41:2,13
barricade [1] 16:4
based [2] 37:15 46:11
beating [1] 47:23
become [2] 18:20 26:10
bedding [1] 34:16
bedroom [6] 23:19,21
35:22,25 36:1,1
beginning [2] 42:22,25
believes [1] 7:23
belonged [1] 12:2

Bethel [11] 2:13,19 3:2,9
3:15 8:22 11:7 26:7,9
32:10 38:12
between [2] 40:2,14
beyond [1] 46:12
big [1] 20:11
bill [5] 46:20 49:21,23,25
50:2
Bilyeu [17] 3:15 31:23
31:25 32:2,8,13 33:22
34:20 35:6,9,13 37:13,14
39:9 40:21 41:11 48:5
Bilyeu's [2] 48:6,23
blood [19] 9:11,12,17
20:5 21:10,14 27:25,25
30:4,6,7 32:25 33:1,19,20
34:13,15,15,17
bloody [1] 33:1
body [1] 6:11
bothered [1] 12:11
bothering [1] 12:12
bought [4] 39:20,21,25
42:13
box [6] 11:7 26:7 32:10
37:9,9 38:12
brags [2] 23:25 24:3
break [4] 34:22,24 35:4
39:17
brief [1] 35:4
briefly [1] 8:12 29:13
bring [12] 9:21 23:5 25:19
36:6 40:8,9 41:12 42:14
47:22 48:3,9 49:4
broke [1] 39:14
broken [7] 9:4,6,7 14:1,5
16:4 28:12
brought [7] 23:7 35:19
35:20 40:12 41:13,17
47:19
brown [1] 39:24
bruise [1] 33:5
building [6] 2:15 4:16
4:19,22 5:7,9
bullets [1] 35:23
burglary [8] 2:8 4:12,13
4:15,16,17,18,24
business [2] 26:6 32:9
buy [2] 40:1,17

**-C-**

C [5] 2:1,24 3:6,13 43:21
C-clamps [1] 2:24
cab [2] 33:11,11
caliber [1] 23:23
cannot [2] 25:11 45:11
capable [7] 3:11 6:5,20
6:23 7:3 8:25 47:23
care [3] 11:9 38:20 42:23
Carol [1] 4:2
carry [1] 22:12
case [17] 2:3 4:5,12 8:19

10:14,17 34:25 35:14
36:12,17 43:15 44:3,7,18
46:2,14 47:4
cases [1] 36:18
caused [1] 6:7
causes [5] 5:23 6:9
causing [4] 5:13 6:6,20
8:5
cautioned [1] 10:16
certified [1] 43:21
chamber [1] 35:24
chance [3] 19:18 41:8,25
charge [1] 5:5
charges [8] 2:8,12,18 3:1
3:8 4:12,14,17
children [1] 18:18
choke [4] 18:24 19:1,24
34:12
choked [1] 28:13
choking [4] 2:24 18:3,15
18:24
choose [2] 44:13,14
circumstance [6] 6:24
7:2,17,19,24 8:1
circumstances [3] 6:4
6:8,19
City [1] 26:9
clamp [1] 34:10
clarify [1] 48:15
Class [2] 2:17,24 3:6,13
CLERK [1] 13:15
closer [1] 13:17
clothes [4] 21:16 28:1
30:5,6
clothing [7] 9:12,17
21:10,14 33:2,3,19
coming [4] 16:3,9 39:10
43:16
comment [5] 31:1 36:15
36:19 39:5,6
comments [2] 17:8,9
commit [5] 2:16 4:19,24
5:10,19
commits [6] 4:14,15,17
5:21 6:14 7:10
completed [1] 33:24
concealable [1] 45:6
concealed [5] 3:11 7:12
8:2 45:10,12
concerned [1] 22:2
concur [1] 50:3
condition [1] 45:3
conduct [5] 7:4,17,19,24
8:1
Confers [1] 13:15
conflicting [1] 46:15
conscious [1] 5:12
consciously [1] 7:1
consider [2] 36:17 39:7
consideration [1] 2:7
considered [1] 40:16

---

GRAND JURY PROCEEDINGS

constitutes [1] 7:4
contact [3] 25:4,8,12
continued [2] 17:21
  35:11
contract [1] 11:10
control [2] 45:16,21
controverting [2] 46:2
  46:3
convicted [3] 3:12 7:13
  8:7
conviction [3] 10:1 44:1
  44:2
convictions [2] 43:22
  43:23
coordinator [1] 11:9
copies [1] 43:21
copy [1] 17:19
correct [16] 10:10 14:14
  14:16 15:13 16:13 23:1
  24:7,17 35:6,16 39:16
  42:3 45:8,11 47:14 48:5
correctly [1] 33:4
couch [2] 29:6,22
count [20] 2:7,8,8,9,10,12
  2:18 3:1,8 4:12,12,12 6:13
  44:4 45:3 46:21 49:20,22
  49:24 50:1
counts [2] 46:18,19
couple [4] 22:24 24:20
  33:5 35:7
course [1] 24:1
court [4] 3:12 7:14,14,14
cracked [1] 27:10
create [1] 6:8
credibility [2] 44:16,22
credible [1] 46:18
crib [3] 34:16,16,17
cribseat [1] 34:10
crime [14] 2:16 4:14,15
  4:18,20,24 5:10,15,19,21
  6:14 7:11,15 8:7
cut [2] 19:10,11
cuts [2] 9:12 21:20

–D–

D [1] 2:1
danger [1] 32:24
dangerous [6] 2:22 3:5
  5:24 6:3,17,18
dark [3] 18:22 21:12
  23:21
date [1] 12:6
David [21] 2:4,14,20 3:3
  3:10 8:18 11:13,14 14:4
  15:9 16:24 26:11 27:2
  28:6 29:22 31:18 32:14
  35:4 38:17,19 49:15
deadly [2] 6:3,18
deal [3] 21:5 27:25 30:4
death [4] 6:6,9,20 8:6
decide [4] 46:10,16 49:8

49:9
decided [1] 40:16
deciding [2] 44:18 47:1
decision [1] 49:16
decisions [1] 49:18
defendant [3] 3:18 8:19
  8:23
defendant's [1] 3:22
defined [5] 5:6,15,25
  6:17,23
defining [3] 5:12 6:25
  7:18
definition [2] 5:6 7:16
definitions [3] 4:11 8:11
  45:2
degree [20] 2:8,9,10,11
  4:13,14,15,16,17,18,21,24
  5:20,22 6:13,15,22 7:3,10
  7:11
deliberate [5] 10:16
  34:25 44:3 46:9 49:8
deliberations [1] 35:5
demand [4] 21:17,21,23
  22:4
demeanor [3] 28:2 32:21
  47:2
department [6] 8:22 9:5
  26:7,17 27:19 28:8
describe [2] 31:4 39:23
described [4] 5:11 6:24
  7:17 36:13
description [1] 37:3
designed [2] 5:7 8:5
detail [1] 28:10
determination [1] 47:5
deviation [1] 7:4
DFYS [1] 11:10
difference [2] 4:21
  10:12
different [4] 8:15 15:2
  44:11 48:24
difficult [1] 3:20
DIRECT [5] 11:1 26:1
  32:4 35:11 38:2
directed [1] 5:4
discharging [1] 8:5
disconnected [3] 18:14
  18:19,20
discussions [1] 22:5
disfigurement [1] 6:10
disregard [8] 7:3 8:16
  25:6,9 36:15,19 39:5,6
disregards [1] 7:1
distressed [1] 32:22
district [6] 2:5,13,20 3:3
  3:9 13:15
disturbed [3] 12:10 15:5
  15:16
doctor [1] 21:20
doctor's [1] 33:8
doesn't [1] 45:9

door [14] 9:3 14:1,3,5
  15:25 16:4,6,8,10 27:8,10
  28:12 39:14,17
doubt [1] 46:13
down [8] 16:5 19:22 20:5
  32:25 38:5 39:14,18 43:16
draft [1] 16:9
dragged [1] 23:18
Dragoon [1] 37:11
drinking [1] 40:25
drunks [1] 43:7
during [6] 9:18 19:12
  30:17 31:1 48:10 49:3
dwelling [9] 2:15,17
  4:16,22,23 5:6,8,17,18

–E–

E [2] 2:1,1
early [5] 13:12 15:6,15
  27:16 39:10
easily [1] 18:20
effect [1] 25:9
eight [2] 38:24 39:3
either [1] 6:18
elaborate [1] 46:25
Elaine [18] 2:15,21 3:4
  3:16 8:20 10:5,24 11:5
  26:16 27:2,3,19 30:8
  31:18,18 32:18 48:7,8
Elaine's [1] 10:9
element [3] 5:14 7:20
  43:24
employed [2] 11:12
  38:14
End [2] 30:3 50:11
enter [3] 2:14 4:25,25
entered [2] 4:23 5:18
enters [1] 4:18
entry [1] 5:2
escort [1] 12:20
escorted [2] 13:19 15:13
establish [1] 48:18
established [1] 7:21
eventually [1] 33:22
everybody [2] 12:13
  25:9
evidence [22] 8:12,14,14
  10:3 27:9 33:22 34:1
  36:16 43:20,24 44:4,5,7,9
  44:22 45:22 46:2,11,15
  46:17,19,20
exactly [1] 28:10
exaggerated [1] 20:12
EXAMINATION [5]
  11:1 26:1 32:4 35:11 38:2
except [1] 44:3
excuse [2] 2:15 3:24
excused [6] 4:3 25:19
  31:22 34:21 37:15 42:20
exhibits [2] 43:21 50:8
exist [1] 7:23

existence [2] 7:20,22
exists [2] 7:2,19
expect [5] 3:14,16 8:12
  8:13 10:3

–F–

face [2] 20:6 33:5
fact [5] 7:20 25:7,9 40:12
  44:1
fails [1] 5:3
fair [2] 3:22 10:13
fallen [1] 9:15
fare [1] 33:11
fear [5] 3:4 6:16 9:24 31:4
  31:5
fed [1] 14:19
feeling [1] 31:1
fell [2] 19:13,14
felon [2] 40:16 45:11
felony [13] 2:17,24 3:7
  3:12,13 5:17 7:13 8:7,7
  10:1 43:23,25 44:2
felt [2] 21:5 32:23
few [1] 33:6
final [1] 44:6
Finally [1] 7:9
finding [2] 44:3 46:7
fine [1] 37:20
finish [1] 35:1
firearm [4] 3:11 7:12 8:2
  8:3
first [20] 2:8,11 4:12,13
  4:14,15,21,24 7:9,11 10:4
  11:23 13:11,19 14:4 26:14
  31:12,15 38:20 48:11
flashlight [5] 2:23 9:8
  20:18 28:19 34:4
fleeting [1] 45:18
floor [3] 30:4 34:4,16
follows [5] 10:25 25:25
  32:3 35:10 38:1
force [3] 14:4,6 15:21
forced [5] 9:3 13:4 27:6
forcing [1] 9:4
foreperson [11] 4:8,9
  35:6 37:18 49:18,21,23
  49:25 50:2,4,7
foster [1] 11:9
found [4] 6:14 7:10 27:2
  29:22
four [2] 2:6 24:21
fourth [5] 2:13,19 3:2,9
  45:2
frame [1] 27:10
friend [5] 9:21 23:4 35:18
  39:7 47:20
friend's [1] 9:13
friends [2] 11:20 42:22
front [3] 16:8,10 33:20
frustrated [1] 21:4

full [1] 38:7
function [1] 6:11
funeral [1] 15:6

–G–

G [1] 2:1
given [5] 8:11 36:10 44:6
  46:25 47:9
giving [1] 17:13
gone [1] 25:15
good [1] 42:22
grand [17] 3:24 4:7,10
  10:13 19:19 24:23 30:22
  34:20 36:14 37:14 39:4
  42:8 43:21 44:17,19,23
  46:9
great [2] 27:25 30:4
gross [1] 7:4
guess [1] 45:24
gun [37] 10:1 22:23 23:5
  23:10,13,19,23,25 24:3,5
  30:18 35:22 36:2,3,6
  39:12,15,19,20,21,23,25
  40:8,9,12,18 41:5,12
  45:19,20 47:9,20,22 48:4
  48:9 49:2,4
guy [2] 17:2 48:3

–H–

H-E-R-R-E [1] 38:9
H-O-D-G-E-S [1] 26:5
hair [1] 27:25
hand [7] 3:18 10:20,21
  25:20 31:23 37:18,21
handing [2] 45:19,20
handle [1] 39:25
hands [8] 4:6 8:11 10:14
  25:10 31:21 34:21 36:19
  39:6
hangers [1] 20:2
he'd [4] 9:15 16:25 34:11
  35:24
head [21] 9:8,11,12,22
  19:10,11 20:1 21:20 22:24
  23:11,13,19 28:14 29:5,8
  30:18 33:1,1 34:9 35:22
  49:2
health [1] 6:10
hear [4] 3:14,16 8:14,16
  8:18 9:21,25 16:19,21
  44:24 45:23 48:15,25 49:9
heard [5] 16:18,22 24:4
  45:5 46:15
held [2] 22:23 23:10
help [2] 28:22 44:3
Herrera [25] 3:17 9:21
  23:5,7 35:20 36:1,3,3,5
  36:10 37:16,19,22,24,25
  38:9,15 41:6 42:7,20
  43:10 48:3,9 49:4,5
Herrera's [3] 36:11,25
  37:5

Case 4:03-cv-00013-RRB    Document 59-22    Filed 05/25/2006    Page 19 of 21

**highly** [1] 32:22

**hinge** [1] 19:24

**hit** [10] 19:3 20:1,10,13 20:17,18,22 28:14 29:5,8 34:9

**Hodges** [16] 3:15 8:21 8:24 9:4 13:7 17:16 18:11 22:9 25:20,23,24 26:5,10 30:22 33:18 39:10

**home** [5] 5:8 8:22 9:14 9:16 41:14

**hospital** [4] 22:1 33:7,12 33:14

**hours** [1] 39:11

**house** [33] 9:13,20 12:20 14:23 15:11 17:10,25 18:1 21:13 22:7 23:1 24:16 26:18,22 27:3 28:13 30:1 31:13,14,20 35:19 36:3 36:11 37:1,5 39:10,15 40:8,13,19 42:14 47:12 47:13

**household** [1] 9:9

**humidifier** [8] 2:23 20:11,13 28:21 29:2,4 34:7,8

**hung** [1] 34:10

**hurt** [1] 22:2

**hysterical** [1] 32:22

-I-

**ID** [1] 25:16

**II** [2] 2:18 49:22

**III** [2] 3:1 49:24

**ill** [1] 43:5

**imminent** [2] 3:4 6:16

**impairment** [3] 6:2,10 6:11

**impartial** [1] 3:22

**impossible** [1] 3:20

**imprisonment** [2] 5:16 8:8

**inaudible** [1] 13:15

**incident** [15] 21:11 24:6 24:15,19 27:15 30:8,9 36:7,8,15 47:10 48:12 49:1,2,3

**incidents** [1] 11:22

**including** [1] 8:3

**inconsistent** [2] 44:8 44:21

**indicate** [5] 27:5 28:19 29:10,14 30:11

**indicated** [4] 34:3,10 35:15 36:4

**indicating** [1] 25:11

**indictment** [5] 2:7 8:10 49:9,20 50:9

**indiscernible** [16] 11:16 15:7,24 17:3 18:4,5,9 20:22,24 21:19 24:21 25:17 29:19 41:21 42:24 43:4

**inference** [1] 25:7

**information** [2] 35:13 36:9

**informed** [1] 10:9

**initial** [1] 33:25

**injuries** [5] 19:6,9 32:21 33:2,6

**injury** [5] 2:21,22 3:5 5:22,23 6:1,2,6,7,7,9,16 6:21 8:6

**inoperable** [1] 8:5

**inside** [3] 16:13 27:2 36:1

**install** [1] 18:18

**installed** [1] 18:17

**instructed** [2] 44:1 45:25

**instruction** [4] 44:6 45:17 46:10,25

**instrument** [6] 2:22 3:5 5:24 6:3,17,18

**intent** [10] 2:16,21 4:19 4:23 5:10,14,19,22,25 6:1

**intentionally** [2] 5:11 5:13

**interest** [1] 47:4

**interrogation** [1] 31:2

**interview** [6] 9:18 17:14 22:9 28:7 29:2 35:13

**interviewed** [1] 30:8

**interviews** [1] 33:25

**intoxicated** [4] 7:7,25 31:9,10

**investigation** [3] 26:11 32:13,17

**invitation** [1] 15:18

**invited** [1] 15:18

**involved** [7] 4:6 11:20 11:21 26:10,14 31:8 32:13

**involving** [5] 2:10 7:9 7:11 36:12 43:25

**issues** [1] 46:5

**it'll** [1] 13:17

**items** [2] 9:9 19:3

**IV** [2] 3:8 50:1

-J-

**jail** [5] 25:5,7,10,12 42:16

**jealous** [1] 17:2

**jerked** [2] 19:23,23

**Job** [1] 46:6

**John** [5] 25:24 26:5 32:2 32:8 35:9

**Jose** [3] 3:16 37:25 38:9

**judgment** [2] 44:16,22

**Judicial** [4] 2:13,19 3:2 3:9

**jumper** [1] 34:14

**June** [3] 40:2,14,14

**juror** [29] 3:21,23,24 4:2 4:4 10:13 24:25 30:23 45:1,5,9,13,24 46:5,23 47:7,13,15,16,17,21 48:1

48:8,11,14,17,20,22 49:5

**jurors** [11] 4:7,10 24:23 30:22,25 34:20 37:14 39:4 42:8,10 44:23

**jury** [7] 19:19 36:14 43:21 44:17,19 46:9 47:1

-K-

**keep** [1] 16:9

**kicked** [3] 16:5 27:8 28:12

**kill** [10] 3:6 9:10,23 17:11 17:17,22,24 29:12 30:20 35:24

**killed** [1] 32:25

**kind** [6] 11:11,19 17:9 19:9 33:9 38:25

**kitchen/living** [1] 34:6

**knew** [1] 10:13

**knowingly** [5] 3:10 7:12 7:16,16,25

**knowledge** [3] 7:20,21 30:15

**known** [3] 11:15,16 38:24

**knows** [5] 3:17 4:6 42:15 42:15,16

-L-

**large** [1] 34:7

**last** [9] 4:5 10:10 11:4,5 26:4 32:7 34:23 36:15,19 38:8,9

**law** [6] 5:12 6:25 7:18 44:21 45:18,21

**lawfully** [1] 5:4

**laying** [1] 34:4

**learned** [1] 9:18

**least** [1] 26:23

**leave** [14] 5:3 8:23 9:1,1 12:10,23 13:2 15:5,15 27:4,4,13 49:8,11

**left** [7] 9:2,4 14:19 15:25 27:4,5 35:25

**lie** [3] 21:2,7 47:3

**life** [2] 9:24 32:23

**light-weight** [1] 34:8

**liked** [1] 43:8

**live** [1] 43:19

**live-in** [1] 11:25

**living** [6] 8:25 11:24 12:3 15:12 29:23 34:5

**loaded** [2] 8:4 35:23

**location** [1] 27:22

**lock** [2] 9:3 16:4

**lodging** [1] 5:8

**longer** [1] 40:15

**look** [5] 23:15 36:16 46:18 47:1,2

**looking** [2] 37:6,8

**loss** [1] 6:10

**lying** [2] 44:12 46:6

-M-

**m** [1] 31:22

**ma'am** [3] 3:18 4:1 24:24 31:7,11

**Madam** [2] 4:7 35:5

**mailing** [4] 11:6 26:6 32:9 38:11

**majority** [1] 50:3

**man** [2] 26:18 42:17

**Manny** [1] 35:20 38:15

**Manuel** [1] 38:9

**Margaret's** [1] 14:24

**marijuana** [1] 41:1

**matter** [1] 40:12

**may** [8] 3:24 4:3 22:13 30:6 34:21 37:15 40:2,14

**mean** [6] 21:3 43:11,17 45:9,13,15

**means** [12] 2:22 3:5 4:25 5:7,9,16,24 6:2,3,7,17 8:3 8:7 44:9

**meant** [1] 35:7

**member** [1] 6:11

**memory** [3] 29:3 33:4 48:1

**memory's** [1] 48:24

**mental** [2] 6:22 7:15

**mention** [1] 28:15

**mentioned** [1] 22:10

**merely** [2] 4:22 45:15

**met** [2] 37:3 38:22

**microphone** [2] 13:17 37:17

**might** [4] 25:10 29:15 45:22 47:3

**mind** [2] 40:24 41:4

**minute** [1] 10:6

**misconduct** [4] 2:10 7:9 7:11 43:25

**misdemeanor** [1] 5:17

**mispronouncing** [1] 10:9

**money** [1] 21:25

**month** [2] 11:12 40:14

**morning** [5] 3:14 8:13 15:6,16 27:16 36:22 39:11

**motive** [1] 47:3

**mouth** [2] 42:4,6

**move** [2] 43:20 44:5

**moving** [2] 19:13 43:23

**Ms** [75] 2:3 3:24 4:3,3,5 4:10 8:21 9:2,7,18 10:8 10:11,12,19,23 11:2 13:16 24:22 25:3,6,18 26:2 27:5 30:21,24 31:6,9,11,21 32:1,5 34:19 35:3,12 36:14 37:13,20 38:3 39:2 39:4 42:7,19 43:4,10,12 43:14,19 44:9 45:4,8,11 45:15 46:4,8,24 47:12,14 47:18,24 48:5,10,13,15

**must** [4] 7:3 8:6,15 24:10

-N-

**N** [1] 2:1

**name** [12] 2:5 4:1 10:9,10 11:3,4,5,5 26:3,4 32:6,7 38:7,8,9,9,15

**nature** [1] 7:3,19

**near** [4] 2:13,19 3:2,9

**necessary** [3] 21:19 22:1 24:14

**neck** [2] 19:25 32:25

**need** [6] 5:14,18 10:21 13:17 18:3 36:16

**needed** [1] 25:16

**never** [2] 40:12 41:5

**next** [3] 12:10 27:16 34:16

**night** [7] 12:5 14:8,21 18:11 27:16 28:11 31:6 36:4

**noise** [2] 16:20,22

**noises** [1] 24:4

**noisy** [1] 18:4

**noon** [1] 34:24

**normal** [2] 12:1 26:20

**now** [14] 16:25 21:10 22:5 22:9 24:6,15 30:8 31:15 34:24 36:9 38:14 39:9 40:7 46:2

**number** [1] 37:12

-O-

**O** [4] 2:1 11:7 32:10 38:12

**oath** [7] 8:17 10:22 18:6 22:15 25:22 31:24 37:23

**object** [1] 33:14

**objective** [2] 5:12,15

**objects** [1] 28:14

**observations** [4] 30:1,5 32:20 34:13

**observe** [4] 7:5 27:24 32:17 33:19

**observed** [2] 9:11 27:11

**obvious** [2] 33:2,20

**obviously** [1] 46:2

**occupation** [4] 11:8 26:8 32:11 38:13

**occur** [1] 7:2

**occurred** [10] 11:22 26:15 27:18 28:11,17 30:12 33:6 35:5,18,25

**occurring** [1] 41:15

**off** [14] 10:6,7,15,17,18 19:24 26:16 35:1,2,5 49:12,13 50:9,10

**offense** [12] 2:17,25 3:7 3:13 5:12,14,16 6:25 7:18 7:21 43:23

**office** [2] 6:26 7

**officer** [31]  3:15 8:21,24
9:2,4 13:7,8,18 14:5 17:13
17:16,20 18:11 19:21
21:25 22:9,15 23:18 25:19
25:23 26:9,10 30:21 31:22
31:23,25 33:18 34:21 39:9
40:21 41:25

**officers** [23]  3:15 9:11
9:15 16:2,3 19:14,17 20:2
20:6,10,15,17 21:2,16
22:5 23:4 24:2,6 29:20
39:9 44:14,15 47:19

**older** [1]  42:17

**once** [3]  37:5 40:15 42:13

**one** [10]  2:8,8,9,10 3:18
8:8 34:22 42:21 43:24
44:6

**one's** [2]  3:11 7:13

**open** [4]  5:2,4 27:8 28:12

**opens** [1]  16:7

**operable** [1]  8:4

**organ** [1]  6:11

**outcome** [1]  47:4

**outline** [1]  8:12

**outside** [1]  43:15

**overlooked** [1]  35:8

**overreact** [1]  24:5

**-P-**

**P** [4]  2:1 11:7 32:10 38:12

**p.m** [1]  26:16

**Page** [1]  29:1

**pain** [1]  6:2

**pants** [2]  30:7 33:21

**PARKES** [65]  2:3 3:24
4:3,5,10 10:8,12,19 11:2
13:16 24:22 25:3,6,18
26:2 30:21,24 31:6,11,21
32:1,5 34:19 35:3,12
36:14 37:13,20 38:3 39:2
39:4 42:7,19 43:4,10,12
43:14,19 45:4,8,11,15
46:4,8,24 47:12,14,18,24
48:5,10,13,15,19,21,23
49:7,14,19,22,24 50:1,3,5
50:8

**Parks** [1]  2:5

**part** [2]  12:17 27:10

**participated** [1]  41:16

**particular** [2]  5:14 7:20

**people** [4]  17:10 31:13
31:20 42:5

**perceive** [1]  47:5

**performed** [1]  6:8

**permanent** [1]  5:8

**permission** [1]  39:17

**person** [32]  3:11 4:14,15
4:17,18 5:5,9,10,21,23,23
5:23 6:14,15,16,23,25 7:5
7:5,6,7,10,12,13,16,18,21
7:22,23,24,25 8:6

**person's** [3]  5:8,12,15

**Peters** [2]  4:2,3

**phone** [3]  18:17,23 49:4

**phoning** [1]  41:12

**photograph** [1]  34:7

**photographs** [2]  34:1
34:17

**physical** [17]  2:21,22 3:4
5:22,23 6:1,1,2,2,3,6,7,7
6:9,16,21 8:6

**pick** [1]  13:18

**picked** [1]  29:4

**pistol** [5]  3:5 8:3 9:22
10:1 40:16

**place** [8]  3:4 5:8 19:23
29:24 33:16 43:1,6,9

**placed** [1]  9:23

**places** [1]  6:15

**point** [1]  12:5

**pointed** [7]  9:22 10:1
30:18 35:22 37:8 47:19
49:2

**pointing** [1]  3:5

**police** [25]  3:15 8:22 9:5
9:13 12:5,14,16,18 13:2
14:8,20 15:13 19:7 21:6
21:16 24:7 26:7,9,17
27:19 28:8 32:12 35:14
41:9 44:11

**PORTION** [1]  50:11

**possess** [4]  3:10 40:15
45:11,15

**possessed** [1]  10:2

**possesses** [1]  7:12

**possession** [4]  45:6,13
45:18 47:10

**Post** [1]  26:7

**prefer** [1]  14:16

**pregnancy** [1]  6:12

**prejudicial** [1]  25:9

**premises** [4]  5:1,1,3,9

**present** [5]  2:6 4:7 8:12
34:23 43:20

**presently** [1]  11:10

**pressure** [2]  18:9 21:4

**Pretty** [1]  39:8

**previous** [5]  35:15 36:12
36:18,18 49:1

**previously** [4]  5:25 24:7
35:10 46:1

**prison** [2]  38:25 39:5

**probability** [1]  7:22

**problem** [1]  45:24

**problems** [2]  8:20 36:18

**procedure** [1]  3:25

**pronunciation** [2]  2:16
10:10

**propelled** [2]  5:1,2

**property** [1]  5:9

**protracted** [2]  6:9,10,10

**provision** [3]  5:11 6:25
7:17

**Ptarmigan** [1]  27:23

**public** [2]  5:3,4

**pulled** [1]  19:23

**purposes** [2]  25:7 43:24

**pursuant** [2]  32:17 36:9

**pushed** [2]  19:21,25,25

**put** [9]  16:3,8,10 18:7
19:22 23:13,19 42:4

**putting** [1]  42:5

**-Q-**

**questions** [24]  8:10 10:4
18:7 24:22,23 25:18 30:21
30:22 31:24 34:20,21 35:7
37:14,15 40:23 42:8,9,19
43:11,12 44:24 45:21
46:24 49:11

**quiet** [1]  43:9

**-R-**

**R** [2]  2:1

**R-A** [1]  38:10

**raise** [6]  10:20,21 25:20
31:23 37:17,20

**reach** [1]  49:16

**reached** [1]  49:18

**read** [1]  4:10

**real** [1]  5:9

**really** [3]  46:6,16,21

**reason** [3]  12:9,17 22:11

**reasonable** [2]  7:5 46:13

**received** [3]  9:5 35:14
36:22

**recklessly** [6]  3:4 6:15
6:23,23,23 7:7

**recollection** [1]  17:20

**record** [25]  2:3,5 3:25 4:7
10:6,7,8,15,17,18,19 11:3
26:3 32:6 35:1,2,3,5 38:4
38:7 49:12,13,14 50:9,10

**recorded** [1]  13:1

**recording** [1]  38:5

**refer** [2]  28:20,22

**reference** [1]  29:2

**refresh** [3]  17:20 29:2
48:1

**refuse** [1]  12:25

**refused** [1]  13:1

**refusing** [1]  8:24

**regarding** [3]  26:11
27:15 30:8

**relating** [1]  48:11

**relationship** [3]  3:19
8:19 11:19

**relative** [1]  12:1

**relevant** [3]  22:11,13,22

**rely** [4]  8:16 44:17,19
48:24

**remain** [3]  2:14 4:25
37:17

**remaining** [1]  5:2

**remains** [2]  4:19,25

**remember** [28]  8:13 13:7
13:18,21 14:1,5 16:1,2
17:12,13,16,22 19:2 23:12
23:14,20 39:9 40:11,21
41:11,15,15,19,20,22,23
44:12 48:2

**removed** [1]  26:18

**repeat** [1]  42:11

**report** [3]  24:13 28:20,22

**reported** [2]  24:7 30:14

**request** [1]  9:1

**REQUESTED** [1]
50:11

**required** [2]  18:6 22:14

**reservation** [1]  15:15

**reservations** [1]  15:5

**residence** [9]  12:1,2 23:2
29:13,21 33:10,16,23,25

**respect** [5]  5:11 6:24 7:8
7:17 8:1

**responded** [1]  8:24

**response** [2]  17:15 21:9

**rest** [2]  15:7,8

**result** [5]  5:11,13,14 6:24
7:2 46:12

**return** [1]  46:20

**revenge** [1]  21:3

**review** [4]  19:18 23:16
41:8,25

**revolver** [4]  8:3 35:21
37:11,12

**rid** [2]  21:6,7

**rifle** [1]  8:4

**right** [28]  3:18 4:10 10:20
10:21 14:20 18:23 19:3
20:15 22:9 25:10,20 34:19
34:24 37:13,18,21 38:14
39:6,19 40:24 41:4 42:7
42:25 43:14 45:10 47:12
47:16 49:10

**risk** [5]  6:8 7:1,3,6,8

**romantically** [2]  11:20
11:21

**room** [5]  16:15,16 34:5,6
34:7

**running** [2]  20:5 32:25

**-S-**

**S** [1]  2:1

**S21996** [1]  37:12

**save** [1]  37:6

**saw** [3]  9:16 16:24 31:20

**says** [1]  17:21

**scared** [1]  28:3

**scene** [1]  13:8

**search** [5]  36:10,20,22,25
37:1

**searching** [1]  37:7

**seat** [2]  2:23 34:14

**second** [12]  2:9 4:16,17

**4:18** 5:20,22 11:25 14:20
14:22 36:7,8 48:10

**see** [14]  3:18 4:6 8:11
10:14 21:14 25:10,15
31:21 34:21 35:23 36:19
39:6 43:2,12

**seeing** [1]  25:1

**seem** [2]  28:2 33:14

**seize** [4]  33:3,22 34:6,9

**seized** [4]  34:1,2,4 37:10

**sentence** [2]  5:16 8:8

**sentenced** [1]  40:15

**separate** [1]  14:25

**separately** [2]  46:19
50:6

**September** [23]  2:12,19
3:2,8 8:21 9:19 11:23,23
24:16,19 26:11 32:15,18
36:23 39:11 40:7,19 47:8
47:15,16,18 48:25 49:3

**sergeant** [1]  32:12

**serial** [1]  37:12

**serious** [6]  6:6,7,9,16,21
8:6

**served** [4]  36:21,25 37:1
39:15

**serves** [1]  33:4

**several** [2]  31:13 36:13

**Sgt** [14]  3:15 32:13 33:22
34:20 35:6,13 37:13,14
39:9 40:21 41:11 48:5,6
48:23

**short** [1]  34:22

**short-handed** [1]  33:9

**shot** [1]  8:5

**shotgun** [1]  8:4

**should've** [1]  10:16

**show** [4]  10:3 14:3 17:19
27:9

**showed** [3]  9:3 13:9 33:5

**showing** [4]  14:1,5 43:22
43:24

**shown** [2]  4:23 44:4

**sic** [1]  44:10

**side** [1]  30:3

**sign** [1]  50:9

**silver** [1]  39:24

**Simmons** [60]  2:4,7,14
2:20 3:3,10 4:23 8:18,25
8:25 9:1,6,14,20,25 11:13
11:19 12:3,14 13:8,20
22:6 23:10 25:2,4 26:12
27:2,4,16 28:6,12 29:4,8
29:14,22 31:9,19 32:14
33:16 35:4,19,21 36:5,10
36:13,16,17 38:17,19 39:7
39:22 40:7 43:22 44:10
45:19,20 47:9 48:3,8
49:15

**Simmons'** [3]  9:20 30:5
33:19

**simply** [1]  43:24

**simultaneous** [1]  42:24

**single** [1] 37:11
**sister** [5] 12:2 14:24,25 15:2 18:18
**sister's** [4] 21:13 26:21 26:22 31:12
**sit** [2] 13:17 38:5
**sitting** [1] 29:5
**situation** [1] 7:5
**sleeping** [1] 17:25
**small** [1] 41:2
**smart** [1] 42:17
**smoking** [2] 40:25 41:1
**someone** [2] 5:3 17:3
**sometime** [1] 40:7
**sometimes** [1] 38:15
**Somewhere** [1] 40:2
**sorry** [1] 42:20
**sort** [2] 40:25 41:2
**sound** [1] 24:4
**speaking** [1] 29:13
**Specifically** [2] 28:15 29:1
**spell** [3] 26:3 32:6 38:8
**spelling** [1] 11:3
**spoke** [1] 18:11
**stains** [6] 30:7 33:20 34:13,15,15,18
**stand** [7] 10:20,21 25:20 35:7 37:19 44:13 47:3
**standard** [1] 7:4
**standing** [1] 16:24 37:17
**start** [1] 18:3
**started** [3] 18:15 20:5 26:16
**state** [21] 2:4,13,20 3:3,9 3:12 6:22 7:14,15,15 11:3 26:3 31:1 32:6 35:3 38:4 38:7 40:24 41:4 44:4 49:14
**statement** [7] 17:19 19:18,21 20:3 23:15,16 41:8
**statements** [6] 41:20 44:8,15,18,20,21
**states** [2] 5:21 7:14
**Statute** [4] 4:13 5:20 6:14 7:10
**statutes** [3] 4:11 8:10 45:22
**stay** [2] 43:1,6
**staying** [1] 26:22
**steel** [1] 20:2
**step** [1] 37:16
**still** [8] 9:14 10:8 22:6 25:1,4 29:15 33:10 35:7
**strangled** [1] 28:18
**Street** [4] 26:19 27:23 28:13 29:16
**strike** [1] 19:3
**striking** [2] 2:23 9:8
**struck** [1] 34:11

**subpoena** [1] 14:13
**substantial** [3] 6:8 7:1 7:22
**substantive** [2] 44:9,22
**such** [1] 7:3
**suggest** [1] 33:7
**suggested** [1] 22:21
**Susan** [1] 2:5
**suspect** [2] 32:14 33:10
**swear** [1] 37:18
**swing** [5] 9:9 19:22 20:2 28:15,17
**sworn** [4] 10:20 25:21 31:23 35:10

**-T-**

**taking** [1] 40:18
**tape** [1] 13:1
**telephone** [5] 18:2,15,19 29:7,9
**telling** [9] 9:10 14:6 16:2 16:3 17:16,22 40:9 44:17 48:7
**temporarily** [1] 26:23
**temporary** [2] 5:8 11:25
**term** [1] 8:8
**terminates** [1] 6:12
**territory** [1] 7:15
**testified** [6] 10:25 19:19 25:25 32:3 35:10 38:1
**testify** [1] 8:17
**testifying** [1] 14:16
**testimony** [3] 37:15 48:6 48:23
**thank** [3] 35:6 37:13 43:16
**thinks** [1] 17:2
**third** [6] 2:9 6:13,13,15 6:22 14:22
**thought** [6] 9:14 21:7 22:6 29:14 32:24 43:5
**threaten** [1] 17:11
**threatened** [7] 6:5,20 9:22,23 23:11 30:20 35:24
**threatening** [8] 3:6 9:10 17:1,7,17,22,24 29:12
**threats** [1] 29:10
**three** [3] 24:21 30:13 35:17
**through** [2] 11:9,12
**throughout** [1] 31:19
**time-wise** [1] 30:12
**times** [2] 18:17 45:17
**tired** [4] 14:19 15:4 18:9 21:3
**today** [2] 4:4,5
**tongs** [1] 34:11
**too** [4] 3:21 43:7,8 49:10
**took** [13] 15:18 19:23 33:25 34:7,17 35:4 36:3 41:18,18 42:23,23 43:9

47:20
**touching** [2] 45:14,16
**tougher** [1] 46:14
**transcript** [1] 42:1
**treatment** [1] 33:12
**trial** [1] 47:1
**tried** [3] 19:22,24,24
**trip** [1] 18:9
**true** [5] 46:20 49:21,23 49:25 50:2
**truth** [4] 18:12 21:8 44:17 44:19
**truthfully** [1] 18:7
**try** [1] 34:12
**trying** [2] 42:4 48:2
**turned** [1] 20:1
**two** [3] 3:15 31:20 43:21

**-U-**

**unaware** [2] 7:6,23
**uncontroverted** [1] 46:11
**under** [16] 5:20 6:4,8,14 6:19 7:9 8:17 11:10 14:13 18:6,8 21:4 22:15 29:24 33:17 44:20
**understood** [1] 47:7
**unexplained** [1] 46:12
**UNIDENTIFIED** [28] 3:21 4:2,4 24:25 30:23,25 42:10 45:1,5,9,13,24 46:5 46:23 47:7,13,15,16,17 47:21 48:1,8,11,14,17,20 48:22 49:5
**United** [1] 7:14
**unjustifiable** [1] 7:1
**unlawfully** [7] 2:14,20 3:3,10 4:19,25 6:12
**unless** [1] 7:22
**unloaded** [1] 8:4
**unlocked** [1] 15:25
**up** [14] 13:9,18 14:19 16:4 16:20,22,23 17:24 29:4 35:1 37:16,17 38:20 48:2
**upset** [2] 20:12 31:3
**used** [14] 5:7 6:5,5,5,19 6:20,20 28:19 34:3,5,11 37:4 38:20 44:21

**-V-**

**various** [1] 28:14
**vehicle** [2] 5:1,2
**versus** [3] 2:4 35:4 49:15
**victim** [3] 8:19 32:18 35:14
**view** [1] 8:13
**Virginia** [1] 37:11
**visit** [1] 25:15
**voluntarily** [2] 13:5 27:6
**voted** [1] 50:5

**-W-**

**wait** [6] 10:15 33:12 43:14,15,17 49:15
**warm** [2] 31:25 32:1
**warrant** [6] 36:11,20,22 36:25 37:1 39:15
**watching** [1] 17:10
**weapon** [17] 6:4,18 8:3 10:2 35:19 36:9,13,16 37:3,4,8,10 45:7,8,12,17 45:21
**weapons** [6] 2:10 7:9,11 36:18 43:25 47:11
**week** [1] 18:17
**weeks** [6] 22:24 24:20,21 30:13 33:6 35:17
**what'd** [1] 22:20
**whole** [1] 31:3
**wielded** [1] 41:13
**windy** [1] 16:6
**wished** [1] 26:18
**withdraw** [1] 50:8
**witness** [11] 10:4,25 24:23 25:25 32:3 34:22 34:23 35:10 38:1 44:21 47:3
**witnesses** [8] 3:14,17 8:15,17 43:20 44:9,25 49:10
**wondering** [1] 25:1
**words** [2] 42:4,5
**wrap** [1] 19:24
**wrong** [1] 48:6

**-Y-**

**year** [3] 8:8 40:5,6
**years** [2] 38:24 39:3
**yourself** [2] 46:10,17